Neal DEMBY, et al.

v.

Richard S. SCHWEIKER, in his capacity as Secretary of the Department of Health and Human Resources, et al.,

American Academy of Family Physicians, et al., Appellants.

No. 81–1862.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 30, 1981.

Decided and Amended Dec. 15, 1981.

**508**

Stephen E. Lawton, Washington, D. C., with whom Judith L. Harris, Jack N. Goodman and Elizabeth B. Carder, Washington, D. C., were on the brief for appellants. Eugene Tillman, Washington, D. C., also entered an appearance for appellants.

James D. Miller, Washington, D. C., with whom George S. Branch, Washington, D. C., was on the brief for appellees, Demby, et al.

Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth, Kenneth M. Raisler, Scott T. Kragie and Whitney Adams, Asst. U. S. Attys., Washington, D. C., were on the brief for appellees, Schweiker, et al.

Before WRIGHT, MacKINNON and WALD, Circuit Judges.

Opinion announcing the judgment of the court filed by Circuit Judge MacKINNON.

Opinion concurring specially filed by Circuit Judge J. SKELLY WRIGHT.

Dissenting opinion filed by Circuit Judge WALD.

MacKINNON, Circuit Judge:

This case finds doctors pitted against dentists in a contest over their respective entitlements under section 786 of the Public Health Service Act, 42 U.S.C. § 295g–6 (1976). The impetus for this litigation was provided by Congress' decision, following budget recommendations by the President, to pare some $3,050,000 from appropriations for the support of medical and dental training programs. Supplemental Appropriations and Rescission Act of 1981, Pub.L.No. 97–12, 95 Stat. 14 (June 5, 1981). The case presents a question of statutory interpretation, to wit: did Congress, in rescinding a *portion* of its appropriation for medical and dental training under the Public Health Service Act, implicitly accomplish the repeal of a substantive provision of that Act, § 786(c), which requires that not less than ten percent of the total amount appropriated for family medicine and general dentistry training programs be made available to qualifying dental programs?

We hold that the statutory requirement that no less than ten percent of the funds expended under § 786 of the Public Health Service Act be allocated to general practice dental training programs was not repealed but continued in force, and that therefore the Department of Health and Human Services erred in originally allocating only $1,000,000 (or 2.67 percent) of available funds to such programs. Circuit Judges Wright and MacKinnon vote to affirm the judgment of the district court for reasons set forth in their respective opinions.

### I.

Appellants, intervenors below, are the American Academy of Family Physicians, Memorial Hospital of Houston, Texas, and six physicians who direct family practice medical training programs in several states, and are referred to collectively as the "Physicians." Appellees, plaintiffs in the district court, are four dentists (the "Dentists") responsible for general dentistry training programs, also in several different states. The

named defendants in the district court, Richard S. Schweiker as Secretary of the Department of Health and Human Services (the Secretary and the Department respectively), and Dr. Robert Graham as Acting Administrator of the Health Resources Administration of the Department, do not appeal.

## II.

Section 786(a) of the Public Health Service Act (the "Act") authorizes the Department to award grants to institutions operating "professional training program[s] in the field of family medicine," and § 786(b) authorizes grants to qualified programs operating "approved residency program[s] in the general practice of dentistry" and providing financial aid to residents in such programs. 42 U.S.C. § 295g–6(a), (b). Section 786(c), which lies at the heart of this appeal, provides that:

> Not less than 10 percent of the amount appropriated in each fiscal year to make grants under this section shall be made available for grants under subsection (b) of this section [*i.e.*, for grants to dental residency programs].

42 U.S.C. § 295g–6(c).

Following proposals submitted by the President in March 1981 under the Congressional Budget and Impoundment Act of 1974, 31 U.S.C. § 1402(a) (1976), Congress reduced the 1981 appropriation for all "health . resources" by $158,189,000. Pub. L.No. 97–12, 95 Stat. 53 (1981). The conference report on Public Law 97–12, read in conjunction with the report of the House Appropriations Committee, reveals (and the parties are in agreement) that the effect of this measure was to reduce the *total* amount allocated to section 786 programs from $40,500,000 to $37,450,000 for the fiscal year 1981, a reduction of $3.05 million.

In the wake of this reduction of the section 786 appropriation, the Department announced its intention to allocate $36,450,000 of the available funds to family medical practice training programs under subsection (a) and the remaining $1,000,000 to dental programs under subsection (b). This allocation reduced the dental training program share of grants under the Act to 2.67% of the total grants, or approximately $2.7 million less than the ten percent mandated by the statute.

The Dentists filed suit immediately, complaining that this allocation, placing the major portion of the budget cut onus with the dental programs, violated the express terms of the ten percent requirement in section 786(c) and should therefore be enjoined. The district court granted the temporary restraining order sought by the Dentists on July 7, 1981, and on July 17 granted the Dentists' motion for summary judgment. The district judge found that section 786(c) had not been repealed or suspended, and ordered the Department to comply with the ten percent requirement. (J.A. 5).

## III.

The Physicians contend that the budget rescission legislation involved here is in irreconcilable conflict with section 786(c), and so must be held to have suspended or repealed that section. In my view, there is no such necessary incompatibility between the reduction of appropriations and the ten percent requirement of section 786(c), and therefore this contention is without merit.

At the outset, I agree with the Physicians that "[t]here can be no doubt that Congress could suspend or repeal [its own acts]; and it could accomplish its purpose by an amendment to an appropriations bill, or otherwise." *United States v. Dickerson*, 310 U.S. 554, 555, 60 S.Ct. 1034, 1035, 84 L.Ed. 1356 (1940). The *power* of Congress to undo what it has previously done via legislative action is not disputed in this case. Rather, the narrower issue facing us here is whether Congress has in fact *exercised* this power with respect to § 786(c). The parties draw on various bits and pieces of legislative history, each side claiming to find support for its position on this question in the words and acts of legislators and others.

■ Consideration of claims of implied repeal or suspension is confined in the first

instance to the plain language of the laws alleged to be in conflict. Only when the language of two statutes leaves us in doubt as to whether they represent truly irreconcilable intentions do we resort to such legislative history as may bear credibly upon the issue at hand. "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a *clearly expressed* congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (emphasis added). "Only a clear repugnancy between the old . . . and the new" will justify a finding that repeal has occurred. *Georgia v. Pennsylvania Ry. Co.,* 324 U.S. 439, 456, 65 S.Ct. 716, 725, 89 L.Ed. 1051 (1945).

Reading the explicit terms of § 786(c) and the Rescission Act together, I agree with the Dentists that there is no irreconcilable conflict between the two statutes. The rescission provision in Public Law 97–12 states simply that "of the funds provided for 'Health resources' for fiscal year 1981 in Public Law 96–536, as amended, $158,189,-000 are rescinded." The plain language of the two statutes reveals no inconsistency, and this should be the end of the inquiry in the typical case.

This case, however, is complicated by the fact that the Rescission Act's scope is not confined to section 786; the statute encompasses rescissions in at least twelve different "health resources" areas. *See* H.R.Rep. No.97–124, 97th Cong., 1st Sess. 72–73 (1981). This understandable failure to legislate item-by-item makes a direct comparison of the two statutes less than definitive. We therefore do find it necessary to inquire into any legislative history that may provide a true picture of Congress' intent.

■ Turning to the conference report announcing the provisions compromised between the House and Senate versions of the Rescission Act, we find that all section 786 appropriations are treated as a single line item, "Family medicine general dentistry residencies and training." H.R.Rep.No.97–124, 97th Cong., 1st Sess. 73 (June 3, 1981). Because the conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent. Since a reduction in the *dollar amount* allocated to section 786 grants *in toto* says nothing regarding the *proportions* in which those grants are to be awarded, there is no conflict between the conference report and section 786(c).

■ The Physicians would have us probe deeper in our search for legislative intent in hopes of finding such a message. They urge us to consider the various versions of the rescission bills *considered* by the House and Senate appropriations committees, which they suggest—perhaps rightly, but in any case, not relevantly—show that the committees at no time intended to allocate ten or more percent of section 786 funds to the Dentists.[1] *See* Physicians' Br. at 21–22. The intentions of committees of either house regarding a certain subject, where these intentions conflict with the express provisions of existing law, cannot simply be read into a statute that is otherwise silent on the subject. "Expressions of com-

---

1. The Physicians argue that the conference managers, being limited to the matters in dispute, would have exceeded their authority if $3.74 million had been allocated to the dentistry program because the House only appropriated $2.02 million and the Senate zero dollars. That claim is not available here. After Congress has agreed to a conference report it is too late to raise the parliamentary point that the managers exceeded their authority. V Hinds' Precedents of the House of Representatives § 6442 (1907). That allocation to the dentistry program results from the failure of the Congress to repeal a standing provision of law that operated on all appropriation bills. The Secretary pointed out in his letter of June 1, 1981, to the Chairman of the Senate Appropriations Committee, that neither the House nor the Senate Bills included the required appropriation language necessary to overcome the 10 percent set aside for dentistry and if such language was not provided in the final bill the full 10 percent allocation to "General Dentistry" would be required. Letter of Secretary Schweiker to Senator Hatfield, June 1, 1981. This constitutes a knowledgeable interpretation of the resulting factual situation.

mittees dealing with *requests* for appropriations cannot be equated with statutes enacted by Congress ..." *TVA v. Hill*, 437 U.S. 153, 191, 98 S.Ct. 2279, 2300, 57 L.Ed.2d 117 (1978) (emphasis added).[2]

Even supposing that these allocations, produced at what is essentially only a worksheet stage of the budget process, were to be given weight approaching that accorded the actual language of the statute as enacted, I would still be unable to conclude that their contents indicate an intent to suspend the ten percent requirement. In *TVA v. Hill, supra*, the Supreme Court observed that it will be a rare day indeed on which a court may infer the repeal of a substantive statute even from an actual decision by the full Congress to fund, or not to fund, a particular program. In that case, in spite of *repeated* appropriations for the construction of a dam that would destroy the natural habitat of an endangered species *and* the view expressed by the Senate Appropriations Committee that expenditure of the appropriated funds did not violate the terms of the Endangered Species Act's protection of such habitats, the Court held that the Act's prohibitions applied with full force to the funded dam construction project, and that therefore the funds could not be expended as the committee had intended.[3]

The Physicians offer several grounds for distinguishing *Hill*. *See* Physicians' Brief at 17–22. However, these contentions respond only to considerations which the Court in *Hill* found to be "particularly" significant under the facts of that case. 437 U.S. at 191, 98 S.Ct. at 2300. They do not remove the present case from the general rule that Congress' intention to repeal its own acts must be "clear and manifest." *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939).

■ Finally, the parties have proffered as evidence of Congress' intent statements by a Senator and the Secretary found in the legislative record. I do not view these expressions as probative of legislative intent. For example, a letter from Secretary Schweiker to the congressional conference committee studying the rescission urged the insertion of language expressly repealing or suspending the ten percent rule in order that funding for family practice medical programs could continue to be funded at pre-rescission levels. This letter reiterated the express repealer included in the President's original proposal of March 19, 1981. H.R.Doc.No.97–34, *reprinted in* 46 Fed.Reg. 18514 (March 24, 1981). The Dentists point to Congress' failure to adopt the recommended express repealer of an intent to preserve the ten percent requirement. Dentists' Br. at 15–16. I reject the contention that the views of an officer of the Executive Branch—even one who had himself formerly served on the Senate Appropriations Committee—constitute evidence probative of congressional intent under the circumstances here. Such views are binding neither upon Congress nor the courts in determining the meaning of this congressional enactment. They are, in essence, no more than free advice on the subject of how Congress might, if it chose, achieve a particular end. Congress' acceptance or rejection of such counsel suggests little about its true legislative intent. The only value of such comment is as an interpretation by an administrative official.

The remark of Senator Schmitt, upon which the Physicians place heavy reliance, that "[w]e [the conference committee] made no rescission in the primary care areas of family medicine residencies," also has its defects as legislative history. This remark was inserted into the Congressional Record

---

2. *Cf. United States v. Will*, 449 U.S. 200, 222–24, 101 S.Ct. 471, 484–85, 66 L.Ed.2d 392 (1980), in which the Court alluded to floor debate and committee reports on a repealer only *after* concluding that "the *plain words* of the statute reveal an intention to repeal ..." *Id.* at 222, 101 S.Ct. at 484 (emphasis added). Finding the "plain words" of both the Rescis-

sion Act itself and the conference report here insufficient to indicate an intent to repeal, I do not find the more attenuated history proffered by the Physicians persuasive of their claim.

3. *See TVA v. Hill*, 437 U.S. at 167, 171, 98 S.Ct. at 2288, 2290.

*after* the rescission act had been passed by the House and Senate. 127 Cong.Rec. S 5802 (June 4, 1981). Although the statements of a member of Congress as intimately acquainted with a bill as Senator Schmitt was in this case are to be considered very carefully, his remarks, made after the passage of the bill, cannot be considered to have influenced members' voting decisions. In any event, the limited nature of Senator Schmitt's remark might well support contradictory interpretations.[4]

Standing between the record in this case and a finding of implicit repeal is one simple fact: *Congress* did not amend the provision which specified the relative positions of doctors and dentists under the Public Health Service Act. Section 786(c) represents a considered legislative judgment that general practice dentistry is deserving of at least ten percent of the support devoted to training programs under section 786. The Physicians are able to point to legislative and executive *comment* to the effect that family practice medical training is deserving of far greater attention than the corresponding dental programs, *see* Physicians' Br. at 25–26 (*quoting* S.Rep.No.97–67, 97th Cong., 1st Sess. 226–27, 229 (1981)), U.S. Code Cong. & Admin.News 1981, p. ——. I am compelled to agree with Dentists, however, that such comment does not constitute a law repealing the ten per cent requirement. *See* Dentists' Br. at 18–19. In any event, family practice medical training will still receive fully 90 percent of the funds available under section 786 in the affected year.

■■ In light of the foregoing, it seems barely necessary to repeat the frequently stated and eminently sound maxim that the policy against repeals by implication is of particular force when the purported repealer takes the form of an appropriations enactment. *TVA v. Hill*, 437 U.S. at 190, 98 S.Ct. at 2299. While repeals of substantive law in appropriations bills are accomplished every session by Congress, they are infrequent, and this is not such a case. For here the evidence does not even establish the predicate for the application of the rule disfavoring repeal by implication,[5] namely, that there is truly serious doubt as to the vitality of the substantive statute. It is difficult to imagine that any member of Congress, even one having the ten percent requirement in the forefront of his consciousness, would consider that he was voting for the repeal of section 786(c) in assenting to the reduction as it was presented in the conference report.[6]

---

4. Senator Schmitt's remark on family practice funding made no reference to any corresponding decision to cut dental program funding or to suspend the operation of § 786(c). Thus the statement told at best only half the story of the committee's actions.

5. The Physicians' analysis of *TVA v. Hill, see* Physicians' Br. at 17–22, fails to perceive the effectively two-tiered nature of the inquiry into implicit repeal. Although *Hill* mentions the absence of an "irreconcilable" conflict between an earlier act and a later act as *one* consideration in the inquiry, 437 U.S. at 192, 98 S.Ct. at 2300, in my view logic compels that this consideration be placed at its threshold. For if it appears from a comparison of the enactments that it was possible for Congress simultaneously "to regard each ... as effective," that lack of conflict will in the normal case end the inquiry. *Id.* Only in the exceptional case where serious doubt on the question of "conflict" persists should it be necessary to enter into the more difficult and institutionally treacherous investigation of the weights and priorities attached by Congress to its various

legislative duties, one of which is the appropriation function.

6. There are numerous examples to be found in the books of various enactments, including appropriations acts, explicitly repealing substantive provisions of law. The "appropriation" continuing funding for the Tellico Dam in the wake of *TVA v. Hill, supra,* is such an example. There, Congress provided that "notwithstanding the provisions of 16 U.S.C., chapter 35 or any other law," the TVA was "authorized and directed" to complete Tellico Dam. Pub.L.No. 96–69, 93 Stat. 437, 449 (1979). Such an "appropriation" is manifestly much more than the mere provision of funds; it is a substantive enactment in an appropriations bill. Because I dispose of appellants' argument for implied repeal by finding the absence of any colorable claim of contradiction between the two acts, I find it unnecessary to rely upon the further fact, demonstrated by such explicit repealers, that Congress is capable of explicit repeal when it so intends. In passing it should be noted, however, that such explicit terms can be found with respect to other appropriations

## IV.

Therefore, it is my conclusion that Congress, in passing the Supplemental Appropriations and Rescission Act of 1981, did not indicate an intent to repeal § 786(c) or in any way suspend its operation. Appellants have failed to point to any persuasive evidence of such intent on the part of *Congress* —as distinct from various of its constituent members, committees, or other advisors. While it may be possible to interpolate from the acts and expressions of individual legislators or committees a desire to repeal § 786(c), that interpolation would require a reversal of the presumption consistently applied by the Supreme Court in similar cases.

The judgment of the district court is therefore affirmed for the separate reasons set forth in the above opinion and the following opinion of Judge Wright.[7]

*Judgment accordingly.*

J. SKELLY WRIGHT, Circuit Judge, concurring specially:

I agree with the result reached by Judge MacKinnon, but not for the reasons stated in his opinion.

It is a cardinal rule of statutory construction that repeals by implication are not favored, but there are two well settled categories of implied repeals. *TVA v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); *Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *Posadas v. Nat'l City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936).

First, if Congress provided an "affirmative showing of an intention to repeal" the earlier statute, and if its intention is "clear and manifest," then the courts will recognize an implied repeal. *TVA v. Hill, supra,*

437 U.S. at 190, 98 S.Ct. at 2299; *Posadas, supra,* 296 U.S. at 503, 56 S.Ct. at 352. This criterion may be satisfied without explicit statutory language; otherwise the repeal would be express rather than implied. Moreover, in my view the courts may properly examine the reports of House and Senate committees as well as the conference report in deciding whether the requisite "affirmative showing" has been made. In this case, however, I find that the differing appropriations figures adopted by the House, Senate, and conference committees fail to point to an unequivocal legislative intent. Therefore, I cannot accept appellants' contention that the rescission act passed in June 1981 implicitly repealed the ten percent set-aside provision in Section 786(c) of the Public Health Service Act, 42 U.S.C. § 295g–6 (1976).

The second category of implied repeals is where the provisions of the two statutes are in irreconcilable conflict. The later statute constitutes an implied repeal of the earlier one to the extent that they conflict. *TVA v. Hill, supra,* 437 U.S. at 192, 98 S.Ct. at 2300; *Posadas, supra,* 296 U.S. at 503, 56 S.Ct. at 352. In the present case, however, the rescission act can be construed to be consistent with the earlier ten percent set-aside provision.

Neither of the two alternative tests for repeals by implication has been satisfied in this case. The subsequent action of Congress supports this view. Apparently uncertain whether it had expressed a "clear and manifest" intent to repeal Section 786(c) in its June 1981 rescission legislation, on August 13, 1981 Congress explicitly adopted a statutory provision repealing Section 786(c) for the future. Omnibus Budget Reconciliation Act of 1981, Pub.L.No.97–35 § 2742(c), 95 Stat. 923 (1981).

---

even within the very bounds of the Rescission Act here in issue. *See* Pub.L.No.97–12, 95 Stat. 57 (rescission of student financial assistance program explicitly suspended application of Higher Education Act).

7. Subsequent to the commencement of this action, section 786(c) was explicitly repealed with respect to future fiscal years by the Omnibus Budget Reconciliation Act of 1981, Pub.L.No. 97–35, § 2742(c), 95 Stat. 357, 923 (August 13,

1981). Just as Congress' suspension of the requirements of the Endangered Species Act subsequent to the decision in *Hill* (*see* note 6 *supra* ) cannot alter the Supreme Court's pronouncement of the proper rules of statutory construction to be followed by the federal courts, Congress' repeal of the ten percent requirement in section 786(c) affects neither the analysis nor the conclusion in the present case.

**514**

WALD, Circuit Judge, dissenting:

The critical question in this case is whether Congress intended to suspend § 786(c)'s formula for allocating grants to family medicine and general practice dentistry residency programs when it passed the Supplemental Appropriations and Rescission Act, 1981, Pub.L.No.97–12, 95 Stat. 14 (June 5, 1981) (the "Act"). *See United States v. Will*, 449 U.S. 200, 221–22, 101 S.Ct. 471, 483–84, 66 L.Ed.2d 392 (1981); *Roe v. Casey*, 623 F.2d 829, 836 (3d Cir. 1980).[1] Since the plain language of the Act is consistent with any formula for dividing funds between the two programs, it is both appropriate and necessary to examine the Act's legislative history to determine congressional intent.[2] In this case, the overwhelming weight of that history supports the conclusion that Congress sought to suspend operation of the set aside. I therefore dissent.

1. Under the canon of construction disfavoring repeals by implication, of course, courts are ·reluctant to read one congressional enactment as implicitly repealing or suspending an earlier one. *See United States v. Will*, 449 U.S. 200, 221–22, 101 S.Ct. 471, 483–84, 66 L.Ed.2d 392 (1980); *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); *Morton v. Mancari*, 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936). But this does not mean that courts should ignore clear evidence of Congress' intent to override prior law. *See United States v. Will*, 449 U.S. at 223–24, 101 S.Ct. at 484–85. The question of legislative intent is ultimately one to be resolved by applying "the accepted rules for ascertaining that intention." *Posadas v. National City Bank*, 296 U.S. at 504, 56 S.Ct. at 352. *See Morton v. Mancari*, 417 U.S. at 547–50, 94 S.Ct. at 2481–82.

2. If the language of the Act were clear, there would be no need to look to its legislative history. *See McCord v. Bailey*, 636 F.2d 606, 614–15 (D.C.Cir.1980), *cert. denied*, 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981); *Albright v. United States*, 631 F.2d 915, 918 (D.C.Cir.1980); *Zerilli v. Evening News Ass'n*, 628 F.2d 217, 220 (D.C.Cir.1980). But the Act itself could hardly be less clear as to the continued operation of § 786(c). The Act merely provides:

The legislative history of the Appropriations Act[3] is replete with statements that the dentistry residency program should be funded at a level short of that prescribed by § 786(c)'s ten percent set aside formula. The report accompanying President Reagan's recommended budget rescissions, for example, explained that the decision to cut the entire funding of the dentistry program "specifically reflect[s] the Administration's assessment that the current supply of dental health professionals is adequate." 46 Fed.Reg. 18513 (1981). The Senate Report explained its decision to totally eliminate funding for the dentistry program in similar terms: "The Committee believes this is a low-priority program that, if needed, would be better funded at the State level or through private sources, and has terminated it." S.Rep.No.67, 97th Cong., 1st Sess. 227 (1981). Even the House Report, which recommended continuation of the dentistry

HEALTH RESOURCES ADMINISTRATION
HEALTH RESOURCES
(RESCISSION)

Of the funds provided for "Health resources" for fiscal year 1981 in Public Law 96–536, as amended, $158,189,000 are rescinded.

Pub.L.No.97–12, 95 Stat. 14, 53 (June 5, 1981).

It is therefore appropriate to consider Congress' intent, as expressed in committee reports and other legislative history.

3. I see no reason to artificially restrict this inquiry into legislative history to the Conference Report. Indeed, Judge MacKinnon's unwillingness. to review all relevant legislative history, *maj. op.* at 510–511, contravenes the Court's most recent pronouncement on determining whether Congress has repealed prior law by implication. In *United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980), the Court looked at the full range of traditional sources of legislative history before concluding that Congress had implicitly suspended a statute providing automatic pay raises for judges. The attempt to distinguish *Will* as a case in which " 'the *plain words* of the statute reveal an intention to repeal ...,' " at *maj. op.* 511 n.2 (quoting *United States v. Will*, 449 U.S. at 222, 101 S.Ct. at 484 (emphasis supplied)), fails to acknowledge that *Will* involved *four* statutes, only one of which included plain language indicating an intent to repeal automatic pay raises. With regard to the other three statutes, the *Will* Court looked to committee reports and statements by legislators to discern Congress' intent.

program, cut its funding in half, thereby allocating considerably less than would be required under the ten percent set aside. H.R.Rep.No.29, 97th Cong., 1st Sess. 211, 212–13 (1981).[4] Thus while only the President's proposed bill and its accompanying report specifically mentioned an express suspension of the ten percent formula,[5] both Houses of Congress explained their rescission actions as affecting specific programs in a way that was totally inconsistent with the continued application of the set aside.

As a counterweight to these unequivocal statements of how the House and Senate wanted funds divided between the family medicine and dentistry programs, Judge MacKinnon's opinion relies on an ambiguous table contained in the Conference Report. See H.R.Rep.No.124, 97th Cong., 1st Sess. 72 (1981). Noting that this table has a single undifferentiated line item for family medicine and general dentistry programs, it concludes that the Conference Committee must have intended to go back to the ten percent formula and thus to repudiate the actions previously taken by both House and Senate.

Considering the congressional actions that preceded the Conference Committee's deliberations, I do not see how such an inference can reasonably be drawn from the barebones listing of a single dollar figure

for dentistry and family medicine residency programs in the Conference Report. The mandate of conference committees is, after all, to resolve differences between the two Houses, not to reach out and re-decide questions on which both Houses are in agreement (here, the nonapplication of the set aside) or to decide differences in a way that is inconsistent with the thrust of both Houses' actions (here to raise dentistry funds to $3.7 million when the House had voted $2 million and the Senate nothing). See Jefferson's Manual & Rules of the House of Representatives, H.R.Doc.No. 403, 96th Cong., 1st Sess. 595–96 (1979) (Rule XXVIII); Senate Manual, S.Doc. No.1, 96th Cong., 1st Sess. 54–55 (1979) (Rule XXVIII). Although as a court we have no responsibility for enforcing Congress' rules, we can look to them as evidence of what a conference committee meant to do. Here there is no reason to believe that the Committee chose to act outside the customary bounds of its authority; certainly it gave no sign that it was doing so.[6] Indeed, with regard to every other health resources program included in the same amendment as the programs in dispute here, the conferees either reached a compromise between the House and Senate bills or else agreed to the recommendations of one House.[7] Yet by acceding to appel-

---

4. Under the House Report's recommendations, the dentistry program would have received $2,025,000 of the total $30,475,000 allocated to family medicine and dentistry residency and training. See H.R.Rep.No.29, 97th Cong., 1st Sess. 211 (1981). Thus, the program would have received 6.6 percent of the total funding, considerably less than the 10 percent required under § 786(c).

5. The President's proposed legislation specifically provided that the funds for health resources "shall be available notwithstanding the limitations of sections 786(c) and 1516(c) of the Public Health Service Act." 46 Fed.Reg. 18514 (1981).

6. By way of contrast, the specific directives contained in the House and Senate Reports on how to allocate funds between the dentistry and family medicine programs serve to overcome any presumption that the appropriation committees observed the internal rules of the

House and Senate, under which § 786(c) is technically "substantive" law that lies outside their jurisdiction. See Jefferson's Manual & Rules of the House of Representatives, H.R. Doc.No.403, 96th Cong., 1st Sess. 525 (1979) (Rule XXI, cl. 2); Senate Manual, S.Doc. No. 1, 96th Cong., 1st Sess. 15 (1979) (Rule XVI, cl. 4).

7. The explanatory table in the Conference Report sets forth the conferees' understanding as to how $22,745,000 of the $26,080,000 gap between the House and Senate's recommended rescissions should be resolved. The language of the report suggests that the remaining $3,335,000 was allocated according to the provisions of the House bill.

The following table expands on the Conference Committee's presentation, showing that, in adding back funds that the House would have rescinded, the conferees stayed within the range of the two Houses' differences.

lees' interpretation that the conferees considered the two residency programs as a single budget item, Judge MacKinnon's opinion assumes that when the conferees reached those particular programs, they departed from their standard routine and settled their disagreement over a total rescission for the two programs between $4,050,-000 and $10,025,000 by agreeing on a $3,050,000 rescission. This in itself makes little sense. But Judge MacKinnon's assumption yields even more astonishing results when the ten percent formula is applied to the single appropriation of $37 million and the dentistry program—which the Senate sought to terminate and the House sought to cut by 50 percent ($2,025,000)—ends up with its original $4 million almost intact, minus a mere $305,000,[8] while the physicians program—which the Senate left at 100 percent funding and the House cut by only 22 percent—now shoulders 90 percent of the total rescission. I believe a far more plausible interpretation is that the conferees in fact considered the two pro-grams separately just as the Houses had done, yielded to the Senate on the family medicine program by restoring the $8 million the House had deleted, and compromised on the dentistry program at $1 million, a figure midway between the $0 and $2 million figures voted by the Senate and House.[9] They then reported the agreements under a single line item, perhaps because the two programs are treated together for budget authority purposes.[10]

This interpretation is supported by the only piece of legislative history we have about the meaning of the Conference Report. In explaining the Conference Committee's actions after the fact, Senator Schmitt, the chairman of the Labor-HHS-Education Subcommittee of the Senate Appropriations Committee and a Senate conferee, stated: "We made *no* rescission in the primary care areas of family medicine residencies...." 127 Cong.Rec. S5801 (daily ed. June 4, 1981) (emphasis supplied), thereby indicating his understanding that

| | House | Senate | Conference |
|---|---|---|---|
| Local health planning agencies | —24,000,000 | —15,000,000 | —21,000,000 |
| Dental health team grants | —1,000,000 | —500,000 | —750,000 |
| Public health capitation grants | —0 | —4,225,000 | —2,125,000 |
| Health administration grants | —3,000,000 | —1,500,000 | —2,250,000 |
| Public health traineeships | —0 | —500,000 | —250,000 |
| Health administration traineeships | —1,500,000 | —1,000,000 | —1,250,000 |
| Family medicine/ General dentistry and training | | | |
| —Family medicine | —8,000,000 | —0 | |
| —General dentistry | —2,025,000 | —4,050,000 | |
| Total | —10,025,000 | —4,050,000 | —3,050,000 |
| General internal medicine and pediatrics | —1,500,000 | —0 | —0 |
| Nursing Advanced training | —3,000,000 | —0 | —0 |
| Nurse practitioners | —3,000,000 | —0 | —0 |
| Traineeships | —3,000,000 | —0 | —0 |
| Program support | —750,000 | —370,000 | —370,000 |

8. Under the set aside formula, the dentistry program would shoulder 10 percent of the $3,050,000 reduction.

9. Of course, the Committee could have kept within the bounds of its mandate to resolve differences by funding the dentistry program at the $2 million recommended by the House, while shaving $1 million off the total funding for the family medicine program. Such fine tuning of budget cuts, however, is not apparent in the Committee's resolution of other differences between the House and Senate versions of the Act. *See* note 7 *supra.* On the contrary, the Committee's agreements follow a pattern of yielding to the House or Senate recommendations, or splitting the difference. In any event, Senator Schmitt's remarks offer a strong basis for choosing among the combinations of rescissions that are consistent with the view that the Conference Committee stayed within the scope of the two Houses' differences.

10. Most of the programs listed in the Conference Report's table have their own "line items" for budget authority. *See* 42 U.S.C. § 295f(e)(4) (public health capitation grants); 42 U.S.C. § 295h–2 (health administration grants); 42 U.S.C. § 295r(c) (public health traineeships); 42 U.S.C. § 294s(c) (health administration traineeships); 42 U.S.C. § 295g–4 (general internal medicine and pediatrics); 42 U.S.C. § 296*l* (advanced nursing training); 42 U.S.C. § 296m (nursing practitioners); 42 U.S.C. § 297(c) (nursing traineeships). (The fiscal year 1980 authorizations listed in the Code were carried forward to fiscal year 1981 under Pub.L.No.96–536, 96th Cong., 2d Sess. (1980).) The family medicine and general dentistry residency programs are the only programs listed in the table that are treated together for budget authority purposes.

the $3.05 million rescission would come wholly from the dentistry program. As chairman of the Labor-HHS-Education Subcommittee, Senator Schmitt had a special concern with the compromise struck by the conferees, and his remarks offered a comprehensive account of the health resources programs that the Senate conferees had saved from the budget axe. Obviously, his statement is not conclusive evidence of congressional intent, but neither can it be totally ignored as the contemporaneous expression of the Senate Conference Committee member most involved with and knowledgeable about the program items involved in this case.[11] Indeed, Senator Schmitt's reading of Congress' priorities was confirmed just two and a half months later when the same Congress explicitly repealed § 786(c) and added a statutory directive to the Secretary of Health and Human Services to give highest priority to family medicine programs. See Pub.L. No. 35, 97th Cong., 1st Sess. § 2742, 95 Stat. 923 (Aug. 13, 1981).[12]

Finally, I do not find any impediment to reaching this result in the canon of statutory construction cautioning against repeals by implication, especially in appropriations bills. See Tennessee Valley Authority v. Hill, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); United States v. Will, 449 U.S. at 221–22, 101 S.Ct. at 483–84. The concern reflected in TVA—that Members will not ordinarily expect an appropriations act to alter substantive law—does not apply here. In TVA, the Court refused to find that Congress' action in approving funding for a specific dam project created by implication an exception to a comprehensive legislative scheme for protecting endangered species. See Tennessee Valley Authority v. Hill, 437 U.S. at

191, 98 S.Ct. at 2300. Here, however, Congress knew full well that the Appropriations Act dealt with funding revisions and priorities, the very same subject matter addressed by § 786(c)'s set aside formula.

The President's recommendations proposed "a dramatic and significant shift in Federal spending priorities." S.Rep.No. 67, 97th Cong., 1st Sess. 2 (1981). Throughout the House and Senate Reports, this shift in priorities, and the resulting need to evaluate comparatively the importance of programs within each department and division, was the focus of considerable attention. See, e.g., id. at 265 (no rescission warranted in preschool incentive grant program for the handicapped); id. at 276–77 (supplemental appropriation for Pell grant program not warranted in the light of substantial reductions in other educational programs); H.Rep.No.29, 97th Cong., 1st Sess. 190 (1981) (funding for engineering feasibility studies in alternative fuels production no longer necessary). Indeed, the low priority status of the dentistry program was specifically addressed in the report accompanying the President's recommendations, see 46 Fed.Reg. 18513 (1981), and in the Senate report. See S.Rep.No.67, 97th Cong., 1st Sess. 226–27 (1981). And although the House Report does not contain similar language, it does itemize the specific amounts to be subtracted from each program. In the context of a rescission bill that explicitly sought to sharply alter spending priorities, these reports gave Congress fair notice that the Appropriations Act would indeed affect prior measures in other authorizing legislation which ordinarily governed the relative funding priority of specific programs.

---

**11.** I disagree with Judge MacKinnon's suggestion that Senator Schmitt's comments should not be accepted as any evidence of Congress' intent. Judge MacKinnon's unwillingness to consider Senator Schmitt's account of the Conference Committee's proceedings is especially puzzling in the light of his reliance on an ambiguous table in that report to rebut the clearly expressed views of the two Appropriations Committees.

**12.** I note too that the Secretary of Health & Human Services (HHS) interpreted the Conference Committee action as I do, and, until enjoined by the district court, obligated all of the appropriations except for $1 million to the physicians program, even though he had previously written the Senate Committee chairman that an express repeal of the set aside would be necessary to do so.

I therefore dissent from the panel's judgment overruling the Secretary's interpretation of the Act as applied to these programs.