**ASSOCIATION OF METROPOLITAN WATER AGENCIES, Plaintiff,**

and

**American Water Works Association, Plaintiff–Intervenor,**

v.

**Carol M. BROWNER, Administrator United States Environmental Protection Agency, et al., Defendants.**

**No. CIV. A. 97–2111–LFO.**

United States District Court, District of Columbia.

Oct. 13, 1998.

Thomas Hylden, Washington, DC, Robert J. Saner, Powers, Pyles, Sutter & Verville, P.C., Washington, DC, for Plaintiffs.

Wendy Lynn Blake, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, for Defendants.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff, the Association of Metropolitan Water Agencies, and plaintiff-intervenor, the American Water Works Association, challenge the decision of defendant Carol M. Browner, Administrator of the United States Environmental Protection Agency ("EPA"), not to reserve funds for health effects research from a particular 1997 appropriation. The issues in the case are framed by cross-motions for summary judgment.[1]

### I.

The crux of this case concerns the interplay of two acts of Congress. On the one hand is the Safe Drinking Water Act Amendments of 1996, 42 U.S.C. § 300f et seq. (West Supp.1998) ("1996 Amendments"). Sub-section 1452(m) of the 1996 Amendments authorizes appropriations for so-called drinking water state revolving loan funds—mechanisms by which the EPA grants money to states to develop drinking water facilities. 42 U.S.C. § 300j–12(m) (West Supp.1998). More particularly, § 1452(m) authorizes appropriations of $599,000,000 for fiscal year 1994 and $1,000,000,000 for each of fiscal years 1995 through 2003. *Id.* Sub-section 1452(n) of the 1996 Amendments then provides: "From funds appropriated pursuant to this section for each fiscal year, the Administrator shall reserve $10,000,000 for health effects studies on drinking water contaminants authorized by the Safe Drinking Water Act Amendments of 1996." 42 U.S.C. § 300j–12(n) (West Supp.1998).

On the other hand is the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997, Pub.L. 104–204, 110 Stat. 2874 (1996) ("1997 Appropriations Act"). The "State and Tribal Assistance Grants" section of the 1997 Appropriations Act provides: "That of the $1,900,000,000 for capitalization grants for State revolving funds to support water infrastructure financing, $1,275,000,000 shall be for drinking water State revolving funds." 110 Stat. 2911–12. It is undisputed that the Administrator did not reserve any money from this specific appropriation for health effects studies.

Plaintiff and plaintiff-intervenor ("the Associations") contend that the State and Tribal Assistance Grants appropriation was made "pursuant" to § 1452 of the 1996 Amendments, such that the Administrator was required to set aside funds from it for health effects studies. Further, they argue that the 1997 Appropriations Act appropriated funds for fiscal years 1995, 1996, and 1997, thereby

---

1. On September 18, 1998, plaintiff and plaintiff-intervenor moved for a temporary restraining order and a preliminary injunction. They sought temporary relief because they feared that after the then-current fiscal year ended September 30, 1998, the contested funds would no longer be available. After defendants opposed the motion for temporary relief on September 21, a hearing was held September 28. By Order of the same day, the motion for temporary relief was denied.

obligating the Administrator to reserve $10,-000,000 for health effects studies for each of those three years. The Associations seek a declaratory judgment that the Administrator's failure to reserve funds for health effects studies for those years was unlawful, as well as injunctive relief requiring the Administrator to set aside $30,000,000 for health effects studies from the amounts appropriated under the State and Tribal Assistance Grants appropriation. Plaintiff-intervenor also has requested an order requiring the Administrator to reserve funds pursuant to the health effects set-aside for fiscal year 1998 and subsequent years.

Defendants respond to the Associations' claims with jurisdictional and substantive arguments. As an initial matter, they assert that the Associations fail to satisfy the Article III standing requirements enunciated in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), and therefore cannot properly bring this suit. Even assuming standing, however, defendants contend that the Administrator was not obligated to set aside funds for health effects studies. First, they assert that the 1997 Appropriations Act did not make any appropriations for fiscal years 1995 and 1996. Second, they argue that the specific appropriation in the 1997 Act—the State and Tribal Assistance Grants section—was a specific earmark that did not trigger the set-aside provision in the 1996 Amendments. There are no disputed issues of material fact, and as a matter of law defendants are entitled to summary judgment.

## II.

The first prong of defendants' cross-motion for summary judgment is that the Associations lack standing to pursue their claims.[2] An assessment of whether Article III standing is met is governed by the tripartite framework fashioned by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To carry its burden pursuant to *Lujan*, a plaintiff must show

that: 1) he has suffered an injury in fact; 2) that the injury is fairly traceable to the challenged action of the defendant; and 3) that it is likely that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. As a matter of law, the Associations have made the requisite showings.

It is undisputed that plaintiff's members, who are public agencies, special purpose districts, and regional, county, and municipal authorities, "gather, store, treat, and distribute drinking water to more than 95 million Americans throughout the United States." Pl.'s Stmt. of Undisputed Facts ¶ 2; Defs.' Resp. to Pl.'s Stmt. of Facts at 5. It is also undisputed that in carrying out these tasks, plaintiff's members are required to comply with regulations—promulgated by the Administrator—that establish maximum contaminant levels for drinking water. *See* 42 U.S.C. § 300g–1 (West Supp.1998); Pl.'s Stmt. of Undisputed Facts ¶ 8; Defs.' Resp. to Pl.'s Stmt. of Facts at 7. Congress has mandated that in enacting such regulations, the Administrator shall use "the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific purposes ... and ... data collected by accepted methods or best available methods ...." 42 U.S.C. § 300g–1(b)(3)(A) (West Supp.1998).

Congress' explicit insistence that contaminant regulations stand on "the best available, peer-reviewed science and supporting studies" establishes the instant case as one in which a party brings suit to validate a "procedural right" that protects concrete interests. The paradigmatic procedural right case, as the Supreme Court indicated in *Lujan*, is one in which a person "living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement ...." 504 U.S. at 572 n. 7, 112 S.Ct. 2130. Like the case where the procedural right of an environmental impact statement protects society's environmental interests and the lo-

---

2. Defendants' argument is not grounded in principles of prudential standing, as § 1449(a) of the 1996 Amendments authorizes any citizen to sue

EPA to compel performance of a non-discretionary duty. 42 U.S.C. § 300j–8(a) (West Supp. 1998).

cal population's communal interests, here too the procedural right to health effects studies protects not only the public's interest in safe drinking water but also plaintiff's members' economic and business interests in maintaining efficient, safe, and scientifically-advanced drinking water systems. That this interest is sufficiently concrete is beyond dispute. *See, e.g., Animal Legal Defense Fund, Inc. v. Glickman,* 154 F.3d 426, 431–32 (D.C.Cir. 1998) (en banc) (recognizing a cognizable "aesthetic interest in seeing exotic animals living in a nurturing habitat").

Plaintiff's inability to "establish with any certainty" that health effects studies will lead to regulations that produce benefits to its members does not deprive it of standing. *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130 (standing would exist for hypothetical plaintiff "even though he cannot establish with any certainty that the [environmental impact] statement will cause the license to be withheld or altered"). Neither does the fact that the Administrator may not promulgate new regulations in the immediate future. *See id.* (standing would exist "even though the dam will not be completed for many years"). Indeed, it would make little sense to require plaintiff to defer this lawsuit until the Administrator issues revised regulations, for at that point the procedural right could no longer be vindicated and the harm will already have occurred. Thus, since the Administrator has made clear that she does not intend to set aside funds for health effects studies from the State and Tribal Assistance Grants appropriation, the alleged procedural violation has already occurred, establishing the necessary imminency requirement for standing. *See National Treasury Employees Union v. United States,* 101 F.3d 1423, 1430–31 (D.C.Cir.1996).[3] In light of the foregoing, it is clear as a matter of law that plaintiff has carried its burden of proof with respect to standing.[4]

## III.

### A.

Jurisdiction having been found, the Associations have not established that they are entitled to judgment as a matter of law. To begin with, their argument that the Administrator is obligated to set aside $30,000,-000—$10,000,000 each for fiscal years 1995, 1996, and 1997—is unpersuasive. In advancing their claim, plaintiffs make two interrelated points. First, they observe that § 1452(m) of the 1996 Amendments limits appropriations to $1,000,000,000 per fiscal year; since the State and Tribal Assistance Grants section of the 1997 Act appropriates $1,275,000,000, the Associations argue that the appropriation must be for more than one year. Pl.'s Mot. for Summ. J. at 5–6 n. 3. Second, alluding to a reference in the 1997 Act's conference committee report to $725,-000,000 appropriated for fiscal years 1995 and 1996, the Associations contend that Congress effectively re-allocated—for fiscal year 1997—money whose original appropriation had lapsed. *Id.* (citing H.R. Conf. Rep. No. 104–812, at 75 (1996)).

The Associations' contentions are without merit. The 1997 Appropriations Act, to begin with, makes clear in its opening statement that appropriations made therein are "for the fiscal *year* ending September 30, 1997," Pub.L. No. 104–204, 110 Stat. 2874 (1996) (emphasis added); there is no mention that the appropriations contained in the Act are intended for any other fiscal year. This plain language must control. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of

3. In *Lujan,* the Supreme Court stated that when a party has standing to assert a procedural right, it need not "meet[ ] all the normal standards for redressability and immediacy." 504 U.S. at 572 n. 7, 112 S.Ct. 2130. It is nonetheless clear in the instant case both that the alleged procedural violation is traceable to the Administrator's decision not to reserve funds for health effects studies from the State and Tribal Assistance Grants appropriation, and that injunctive relief requiring her to do so would redress the alleged violation.

4. Once one plaintiff has established standing, the standing of other plaintiffs need not be considered. *Animal Legal Defense Fund, Inc. v. Glickman,* 154 F.3d 426, 445–46 (D.C.Cir.1998) (en banc). Accordingly, defendants' argument—raised for the first time at the June 15, 1998 hearing—that plaintiff-intervenor failed to satisfy the notice provision of 42 U.S.C. § 300j–8(b) is not addressed.

Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") (citation omitted).

Further, by observing that § 1452(m) of the 1996 Amendments limits appropriations to $1,000,000,000 per fiscal year, the Associations provide only a partial account of the pertinent statutory language. In the sentence that directly follows the one articulating the $1,000,000,000 limitation, § 1452(m) continues: "To the extent amounts authorized to be appropriated under this subsection in any fiscal year are not appropriated in that fiscal year, such amounts are authorized to be appropriated in a subsequent fiscal year (prior to the fiscal year 2004)." 42 U.S.C. § 300j–12(m) (parentheses in original). This sentence clearly authorizes appropriation of funds in excess of $1,000,000,000 for a single fiscal year, as long as the excess funds were not appropriated in a previous year.[5]

This condition precedent was satisfied at the time of passage of the 1997 Appropriations Act. While the 1995 and 1996 appropriations acts appropriated funds for drinking water state revolving funds, they were made contingent on passage of legislation establishing such funds. *See, e.g.,* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321, 1321–299 (1996) ("[I]f no drinking water State revolving fund legislation is enacted by August 1, 1996, the ... [$500,000,000 appropriated for FY 1996] shall immediately be available for making capitalization grants under title VI of the Federal Water Pollution Control Act, as amended."); *see also id.* (placing same restriction on $225,000,000 previously appropriated for fiscal year 1995). Since legislation establishing the drinking water funds was not enacted until August 6, 1996—after passage of the deadline by which the earlier appropriations could be made— the 1995 and 1996 appropriations for drinking water state revolving funds converted to appropriations for *clean water* state revolv-

ing funds. The failure of Congress to appropriate the authorized funds for fiscal years 1995 and 1996 therefore triggered the provision in § 1452(m) of the 1996 Amendments allowing it to appropriate more than $1,000,-000,000 for state drinking water revolving funds for fiscal year 1997. Thus, by confining itself to fiscal year 1997, the Appropriations Act necessarily precluded the Administrator from setting aside $10,000,000 for health effects studies for each of fiscal years 1995 and 1996.

This interpretation of the 1997 Appropriations Act is supported by the conference committee report that accompanied it. *See* H.R.Rep. No. 104–812 (1996). The Associations read that report as evidencing Congress' intent to appropriate $550,000,000 for fiscal year 1997, $500,000,000 for fiscal year 1996, and $225,000,000 for fiscal year 1995, Pl.'s Mot. for Summ. J. at 5–6 n. 3; Pl.'s Opp./Reply at 23. But the plain language of the report makes clear indications to the contrary. The report refers explicitly to the conditional appropriations made in Public Law 104–134—the 1996 appropriations act— remarking that the $225,000,000 originally appropriated for 1995 and the $500,000,000 appropriated for 1996 "would revert to the clean water [state revolving funds] on August 1, 1996 unless authorization for the drinking water [state revolving funds] was enacted prior to that date." H.R.Rep. No. 104–812 at 75. The report then acknowledges that while authorization for the state drinking water revolving funds was completed "shortly after that date," it was still "too late to prevent the movement of funds to the clean water [state revolving funds]." *Id.* Thus, the report continues,

> Noting that the clean water [state revolving funds] thus received an infusion of $725,000,000 just prior to the beginning of fiscal year 1997, the conferees have agreed to reduce the 1997 clean water [state revolving funds] appropriation by this amount and use the funds to increase the drinking water [state revolving funds] over

---

**5.** The Associations argue that while § 1452(m) authorizes an appropriation of more than $1,000,000,000 *in* a particular year, the excess funds are actually intended *for* previous years.

Pl.'s Opp./Reply at 23. They offer no authority for this proposition, which is belied by the plain language of the statute.

the $550,000,000 they have otherwise agreed upon as the appropriate fiscal year 1997 level.

*Id.*

This language eliminates doubt about two critical points. First, the report confirms that the original appropriations for fiscal years 1995 and 1996 lapsed when the requisite drinking water state revolving funds legislation was not enacted by the August 1, 1996 deadline. Second, the report establishes that because § 1452(m) of the 1996 Amendments enables authorized but unappropriated funds to be appropriated for subsequent fiscal years, the appropriation *for* fiscal year 1997 was in excess of $1,000,000,-000. In view of the foregoing, as a matter of law the 1997 Appropriations Act did not appropriate monies for drinking water state revolving funds for fiscal years 1995 and 1996. Sub-section 1452(n) of the 1996 Amendments—that concerning the set-aside for health effects studies—therefore was not triggered for those years. Accordingly, as a matter of law the Administrator was not obligated to set aside a combined $20,000,000 for health effects studies for fiscal years 1995 and 1996.

### B.

■ With respect to fiscal year 1997, the Associations argue that the relationship between the 1996 Amendments and the 1997 Appropriations Act is clear, and that its operation here triggered a non-discretionary duty to set aside $10,000,000 for health effects studies. More specifically, they contend that the State and Tribal Assistance Grants section of the 1997 Act appropriated funds "pursuant to" § 1452(n) of the 1996 Amendments, thereby obligating the Administrator to comply with § 1452(n)'s mandate [6] to "reserve $10,000,000 for health effects studies." 42 U.S.C. § 300j–12(n) (West Supp.1998). As a matter of law, this position cannot prevail.

Defendants do not dispute that § 1452(n) of the 1996 Amendments contains a $10,000,-000 health effects studies set-aside, or that

the set-aside is triggered when funds are appropriated "pursuant to this section." Rather, they argue that the 1997 Appropriations Act—or, more particularly, the State and Tribal Assistance Grants section—did not make an appropriation pursuant to § 1452 of the 1996 Amendments. Instead, they assert that the State and Tribal Assistance Grants section made a specific earmark that appropriated funds only to "certain programs" in § 1452 while "excluding funding for others." Defs.' Mot. for Summ. J. at 19. This argument is supported by the plain language of the 1997 Appropriations Act. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778.

The pertinent section of the 1997 Act, the State and Tribal Assistance Grants section, provides: "That of the $1,900,000,000 for capitalization grants for State revolving funds to support water infrastructure financing, $1,275,000,000 shall be for drinking water State revolving funds." Pub.L. 104–204, 110 Stat. 2911–12 (1996). This language establishes as a matter of law that the appropriation for drinking water state revolving funds—namely, the one that concerns the 1996 Amendments—was not pursuant to § 1452 of the 1996 Amendments. First, the appropriation is contained within a more general appropriation for state revolving funds; by definition, then, it is subject to limitations extrinsic to those articulated in § 1452, which does not deal with other types of state revolving funds. Moreover, the umbrella appropriation, which encompasses the drinking water state revolving fund appropriation, is directed only to capitalization grants "to support water infrastructure financing ." Plaintiffs do not—as indeed they cannot—dispute that "infrastructure financing" relates only to the physical structure of the drinking water facilities, and not to any health effects research that may bear on the permissible level of contaminants in the water.

Finally, the statute's use of the phrase "grants for State revolving funds" imposes two clear criteria on the appropriated funds that prevent the health effects set-aside from

---

6. Section 1452(n) instructs that the Administrator "shall reserve" the funds for health effects studies. 42 U.S.C. § 300j–12(n) (West Supp. 1998). Defendants do not dispute that, once the relevant appropriation is found to have triggered this section, the Administrator must carry out this non-discretionary duty.

being triggered. First, the statute mandates that the funds are to be disbursed in the form of grants; since the health effects set-aside does not specify the form in which the research funds are to be disbursed, and since it is equally plausible that the funds could be allocated to in-house personnel to conduct the research, the "grants" condition necessarily earmarks the funds for capitalization purposes. Second, the statute directs that the funds are "for State revolving funds;" this language precludes allocating the funds to any other recipient that does not meet the precise statutory qualification of a state revolving fund. Thus, a plain reading of the 1997 Act establishes as a matter of law that it was a specific earmark whose explicit limitations prevented it from being "pursuant to" § 1452, thereby excluding funding for health effects studies.[7]

This reading of the 1997 Act again is amply supported by the conference report that accompanied it. As an initial matter, however, the Associations contest consideration of this piece of legislative history, arguing that it is inappropriate to consult it unless the relevant statutory language is ambiguous. Pl.-Intervenor's Mot. for Summ. J. at 9.[8] They further contend that "[b]ecause the language of section 1452(n) clearly expresses the mandatory character of EPA's duty, there is no justification for resorting to legislative history . . . ." *Id.* The Associations may indeed be correct were this a case in which unambiguous statutory language were directly contravened by equally unambiguous legislative history. But here, where it has been determined as a matter of law that the 1997 Act unambiguously made a specific earmark that was not pursuant to § 1452 of the 1996 Amendments, it is permissible to consult legislative history that supports the unambiguousness of the statute. The Associations' invocation of Circuit precedent prohibiting courts from "*enforc*[ing] principles gleaned *solely* from legislative history that has no statutory reference point," *International*

*Brotherhood of Electrical Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987) (emphasis in original), or from treating a committee report as being "an *independent statutory source having the force of law*," *id.* (emphasis in original), therefore is inapposite. *See Demby v. Schweiker*, 671 F.2d 507, 510 (D.C.Cir.1981) (a "conference report represents the final statement of terms agreed to by both houses [and] next to the statute itself . . . is the most persuasive evidence of congressional intent").

Turning to the legislative history, the conference committee report states unequivocally: "[T]he funds provided for drinking water State revolving fund capitalization grants should be distributed to all eligible governmental agencies and should be used *solely* for such capitalization grants and grants for public water system expenditures." H. Rep. 104–812 at 75 (1996) (emphasis added). Inclusion of the word "solely" confirms that the State and Tribal Assistance Grants appropriation was a specific earmark—for infrastructure purposes—that was not meant to track § 1452 of the 1996 Amendments, and therefore did not trigger the set-aside provision. The Associations challenge this conclusion by asserting that "expenditures for public water systems can include money for things other than infrastructure development," such as monitoring non-regulated contaminants or health effects research. Pl.'s Opp./Reply at 20. This argument, however, is undercut in two critical respects.

First, defendants advance a persuasive rebuttal that the term "public water system" refers solely to physical structures, such that expenditures for public water systems are by definition expenditures on infrastructure. *See* Defs.' Mot. for Summ. J. at 23. They bolster this contention with reference to the 1997 Act, whose capitalization grants appropriation is made explicitly "to support water infrastructure financing." Pub.L. 104–204,

---

7. This reading of the State and Tribal Assistance Grants appropriation—namely, that its plain language made it a specific earmark, not an implicit repeal of the 1996 Amendments—renders inapposite the Associations' reliance on *Demby v. Schweiker*, 671 F.2d 507 (D.C.Cir.1981). *See, e.g.,* Pl.-Intervenor's Opp. at 15; *see also* Defs.'

Reply at 11 n. 6, Defs.' Mot. for Summ. J. at 21 (eschewing implicit repeal argument).

8. This objection is difficult to square with the Associations' reliance on the conference committee report in a different context. *See supra* III.A.

110 Stat. 2911–12 (1996). Second, the report uses the descriptive term "grants" when it refers to public water systems, just as the statute uses the term "grants" when appropriating funds for capitalization purposes. *See supra* pp. 88–89. Since the health effects set-aside does not mandate that research funds are to be disbursed in the form of grants, and since expenditures for capitalization can only be made in the form of grants to states, the conference report's use of the term "grants" confirms that the funds appropriated by the 1997 Act were intended "solely" to go to state revolving funds to be used for infrastructure purposes; this conclusion is supported by the report's statement that the "grants should be distributed to all eligible *governmental agencies.*" H. Rep. 104–812 at 75 (1996) (emphasis added).[9]

That Congress did not trigger the health effects set-aside with the State and Tribal Assistance Grants section of the 1997 Appropriations Act is further confirmed by the Omnibus Consolidated Appropriations Act, 1997, Pub.L. 104–208, 110 Stat. 3009 (1996). That supplemental appropriations act, passed four days after the 1997 Appropriations Act, specifically appropriated $10,000,000 to EPA's Science and Technology Account for "health effects research to carry out the purposes of the Safe Drinking Water Act Amendments of 1996 ...." 110 Stat. 3009–520.[10] Congress' decision to appropriate to the Science and Technology Account $10,-000,000 for health effects research—the precise amount that would have been appropriated had the set-aside been triggered—is no coincidence. It validates the finding that the 1997 Act was unambiguously a specific earmark that did not reserve funds for health effects studies.

In view of the foregoing, and in the absence of disputed issues of material fact, as a matter of law defendants are entitled to summary judgment. An accompanying Order

grants their motion and denies those filed by plaintiff and plaintiff-intervenor.

### *ORDER*

For reasons stated in the accompanying Memorandum, it is this 10th day of October, 1998, hereby

ORDERED: that defendants' motion to dismiss is DENIED; and it is further

ORDERED: that defendants' motion for summary judgment is GRANTED; and it is further

ORDERED: that plaintiff's and plaintiff-intervenor's motions for summary judgment are DENIED.

---

9. The clarity with which the conference committee report supports the plain language of the 1997 Appropriations Act obviates consideration of the additional legislative history invoked by defendants, namely a floor statement by one Senator and a letter from four Senators to two others. *See generally Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)

(Court has "eschewed reliance on the passing comments of one Member") (citations omitted).

10. Defendants represent, and the Associations do not dispute, that EPA has earmarked $10,000,-000 for health effects studies. Defs.' Reply at 15.