UNITED MINE WORKERS OF AMERICA, Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMIS-SION, Respondent.

UNITED MINE WORKERS OF AMERICA, Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMIS-SION, Respondent,

Helen Mining Company and Kentland-Elkhorn Coal Corporation, Intervenors.

Ray MARSHALL, Secretary of Labor, United States Department of Labor, Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMIS-SION, Respondent,

Kentland-Elkhorn Coal Corporation, Intervenor.

Ray MARSHALL, Secretary of Labor, United States Department of Labor, Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMIS-SION, Respondent,

Helen Mining Company, Intervenor.

Ray MARSHALL, Secretary of Labor, United States Department of Labor, Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMIS-SION, Respondent,

United Mine Workers of America and Allied Chemical Corporation, Intervenors.

Nos. 79–2503, 79–2518, 79–2536, 79–2537 and 80–1021.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 12, 1981.

Decided Feb. 23, 1982.

Cynthia L. Attwood, Counsel, Dept. of Labor, Washington, D. C., with whom Dennis R. McDaniel, Atty., Dept. of Labor, Washington, D. C., was on the brief, for petitioner Ray Marshall, Secretary of Labor, Dept. of Labor, in Nos. 79–2536, 79–2537, and 80–1021.

Mary Lu Jordan and Harrison Combs, Washington, D. C., were on the brief for petitioner United Mine Workers of America in Nos. 79–2503 and 79–2518 and intervenor United Mine Workers of America in No. 80–1021.

Todd D. Peterson, Washington, D. C., with whom Richard McMillan, Jr., Washington, D. C., was on the brief, for intervenor Helen Mining Co. in Nos. 79–2518 and 79–2537.

Anthony J. Steinmeyer and Marleigh Dover Lang, Attys., Dept. of Justice, Washington, D. C., were on the statement in lieu of brief for respondent Federal Mine Safety and Health Review Commission.

George H. Cohen, Washington, D. C. and Mary Win-O'Brien, Pittsburgh, Pa., were on the brief for amicus curiae United Steelworkers of America, urging that the Commission decisions should be set aside, in Nos. 79–2518, 79–2536, 79–2537, and 80–1021.

C. Lynch Christian, III, was on the brief for intervenor Kentland-Elkhorn Coal Corp. in Nos. 79–2518 and 79–2536.

Lee F. Feinberg, Charleston, W. Va., entered an appearance for intervenor Allied Chemical Corp. in No. 80–1021.

Before TAMM and WALD, Circuit Judges, and HAROLD H. GREENE,[*] United States District Judge for the District of Columbia.

Opinion for the court filed by District Judge GREENE.

Concurring opinion filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge TAMM.

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

HAROLD H. GREENE, District Judge:

The issue in these consolidated cases [1] is whether under section 103(f) [2] of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq., miner representatives are entitled to payment of their regular wages for the time they spend accompanying federal officers on certain inspections provided for under the Act.

Section 103(a) of the Act requires the Secretary of Labor periodically to conduct certain mine inspections.[3] No one disputes that miner representatives have a right to be present during these mandatory inspections and that they are entitled to be paid for the time they spend attending them. The controversy here revolves around additional, so-called "spot," inspections conducted by the Labor Department, the question being whether the companies have the duty to provide compensation also for miner representatives' walkaround time with respect to these irregular inspections.[4] The Federal

---

1. Before the Court for review are decisions of the Federal Mine Safety and Health Review Commission in Nos. 79–2537 and 79–2518, *Secretary of Labor v. Helen Mining Co.*, Docket No. PITT 79–11–P (Nov. 21, 1979) (Adm. Rec. at 17); Nos. 79–2536 and 79–2503, *Kentland-Elkhorn Coal Corp. v. Secretary of Labor*, Docket No. PIKE 78–399 (Nov. 30, 1979) (Adm. Rec. at 59); and No. 80–1021, *Secretary of Labor v. Allied Chemical Corp.*, Docket No. WEVA 79–148–D (Dec. 6, 1979) (Adm. Rec. at 80). Petitioners in all the cases are the Secretary of Labor and the United Mine Workers of America. Although the Commission is the respondent, it has not actively participated in the proceedings here, preferring to rely upon its formal decisions. The three mining companies, Helen, Kentland-Elkhorn, and Allied Chemical, have intervened as respondents, and they have filed briefs and have participated in oral argument. The United Steelworkers of America, AFL–CIO, has filed a brief amicus curiae urging that the decisions of the Commission be set aside.

2. Section 103(f), 30 U.S.C. § 813(f), provides in relevant part that

Subject to regulations issued by the Secretary, a representative of the operator and a representative authorized by his miners shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any coal or other mine made pursuant to the provisions of subsection (a) of this section, for the purpose of aiding such inspections and to participate in pre- or post-inspection conferences held at the mine.... Such representative of miners who is also an employee of the operator shall suffer no loss of pay during the period of his participation in the inspection made under this subsection.... However, only one such representative of miners who is an employee of the operator shall be entitled to suffer no loss of pay during the period of such participation under the provisions of this subsection.

3. Section 103(a), 30 U.S.C. § 813(a), provides that

Authorized representatives of the Secretary [of Labor] or the Secretary of Health, Education, and Welfare shall make frequent inspections and investigations in coal or other mines each year for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments originating in such mines, (2) gathering information with respect to mandatory health or safety standards, (3) determining whether an imminent danger exists, and (4) determining whether there is compliance with the mandatory health or safety standards or with any citation, order, or decision issued under this subchapter or other requirements of this chapter. In carrying out the requirements of this subsection, no advance notice of an inspection shall be provided to any person, except that in carrying out the requirements of clauses (1) and (2) of this subsection, the Secretary of Health, Education, and Welfare may give advance notice of inspections. In carrying out the requirements of clauses (3) and (4) of this subsection, *the Secretary [of Labor] shall make inspections of each underground coal or other mine in its entirety at least four times a year, and of each surface coal or other mine in its entirety at least two times a year.* The Secretary [of Labor] shall develop guidelines for additional inspections of mines based on criteria including, but not limited to the hazards found in mines subject to this chapter, and his experience under this chapter and other health and safety laws. For the purpose of making any inspection under this chapter, the Secretary [of Labor], or the Secretary of Health, Education, and Welfare, with respect to fulfilling his responsibilities under this chapter, or any authorized representative of the Secretary [of Labor] or the Secretary of Health, Education, and Welfare, shall have a right of entry to, upon or through any coal or other mine [emphasis added].

4. Such inspections are authorized in mines liberating excessive quantities of explosive gas or in which some other especially hazardous con-

Mine Safety and Health Review Commission answered that question in the negative, and the Secretary of Labor and the United Mine Workers of America petitioned this Court for review. For the reasons stated below, we have concluded that the Commission erred, and we reverse.

## I

The facts are not in dispute. In both *Helen Mining Co.* and in *Allied Chemical Corp.*, employees of the Department of Labor conducted spot inspections of certain mines to check for excessive release of methane gas. See note 4, *supra*. A representative of the miners accompanied the inspector in each instance for the entire

inspection, but the companies refused to pay these employees their wages for the time spent in these inspections. In *Helen Mining Co.*, the Department of Labor thereupon issued a citation under 104(a) and an order under section 104(b),[5] finding that the Company had violated the Act.[6] The Department also petitioned the Commission for an assessment of a civil penalty under section 110 of the statute.[7] In *Allied Chemical*, the Secretary filed a complaint with the Commission charging discrimination by the mining company under section 105(c)(1) of the Act.[8]

After a hearing, an administrative law judge held in *Helen Mining* that no violation of section 103(f) had occurred, and he

dition exists (section 103(i)), and in response to certain requests by miners or miner representatives (section 103(g)(1)). In addition to these inspections explicitly authorized by specific statutory provisions, the Mine Safety and Health Authority (MSHA) of the Department of Labor conducts spot inspections for such purposes as electrical, health, ventilation, roof control, and other examinations. Section 103(f) of the Federal Mine Safety and Health Act Interpretive Bulletin, 43 Fed. Reg. 1754–47 (1978); see note 6, *infra*. As indicated below, section 103(a) provides the Department's ultimate authority for these additional inspections.

5.  Section 104(a) of the Act, 30 U.S.C. § 814(a), authorizes the Secretary to issue a citation to a mine operator whenever he believes that the operator has violated the Act or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant thereto. Section 104(b), 30 U.S.C. § 814(b), provides for the issuance of withdrawal orders to the operator if it is found that a violation described in a citation has not been abated.

6.  The Secretary's construction of section 103(f) can be found in the Interpretive Bulletin issued by the Assistant Secretary of Labor for MSHA on April 19, 1978. *See* note 4, *supra*. The bulletin discusses the types of activities which, according to the Department of Labor, give rise to participation rights by the miners in federal mine inspections. It states that section 103 entitles a miner representative to participate in the inspection of any coal or other mine made "pursuant to the provisions of subsection (a) [of section 103]" and asserts that an inspection is made pursuant to subsection (a) if it is conducted for one of the purposes enumerated in that subsection.

   According to the bulletin, spot inspections are "clearly conducted 'pursuant to' section 103(a)," since "they are carried out for the

purpose of determining if an imminent danger or a violation exists," one of the purposes for inspections enumerated in section 103(a). 43 Fed.Reg. 17547–48. The provision in section 103(a) for mandatory regular inspections of mines is described as the "inclusion of a statutory minimum number of inspections at each mine [which] is no more than an additional requirement [and] does not affect the participation right." 43 Fed.Reg. 17547. The bulletin also lists a variety of activities not giving rise to participation rights under section 103(f). 43 Fed.Reg. 17548.

   In defining the scope of the walkaround compensation right, the bulletin finds that under section 103(f) "protection against loss of pay during participation in inspections is as broad as the participation right itself," and it concludes that "[t]he participation right, and the right to suffer no loss of pay, is not limited to the statutory minimum number of inspections required to be carried out annually by the Secretary." 43 Fed.Reg. 17548–49.

7.  Section 110(a), 30 U.S.C. § 820(a), provides for the assessment of a civil penalty on a mine operator who violates any provision of the Act. Section 110(i), 30 U.S.C. § 820(i), authorizes the Commission to assess penalties proposed to it by the Secretary.

8.  Section 105(c)(1), 30 U.S.C. § 815(c)(1), prohibits discrimination against or interference with the exercise of the statutory rights of any miner. Section 105(c)(2), 30 U.S.C. § 815(c)(2), authorizes the Secretary to file complaints with the Commission for violations of this subsection. For the purposes of the proceeding in this Court, the difference between these procedures and those in Helen Mining are not significant.

denied the petition, but another ALJ concluded in *Allied Chemical* that the Act had been violated and issued a cease and desist order. The Commission affirmed in *Helen Mining Co.* and reversed in *Allied Chemical*, holding that the statute requires compensation to be paid only in connection with the regular inspections.

The *Kentland-Elkhorn* case, the third of these consolidated actions, involved a specialized electrical spot inspection.[9] There, the company refused to pay a miner who accompanied the inspector during the two-day inspection for his walkaround time, and a citation and order were issued under section 104 on account of that refusal. The mining company applied to the Commission for review of the Secretary's enforcement action. The ALJ, after hearing, concluded that section 103(f) applied only to regular inspections, and he vacated the citation and order. The Commission affirmed, citing its previous decision in *Helen Mining Co.*

## II

The scope of a miner representative's right to participate in mine inspections, and his right to do so without loss of pay, are governed exclusively by subsections (a) and (f) of section 103 of the Act.

Under subsection (a), the Secretary is required to determine, among other things, whether an imminent danger exists within a mine, and whether there is compliance with the mandatory health or safety standards and with any outstanding citations,

orders, or decisions.[10] To that end, he must make "frequent inspections" and, more specifically, he is required to "make inspections of each underground coal or other mine in its entirety at least four times a year, and of each surface coal or other mine in its entirety at least two times a year." See note 3, *supra*. Subsection (f), in turn, entitles a miner representative to accompany the federal mine inspector "during the physical inspection of any . . . mine made pursuant to the provisions of subsection (a)," and it further provides that any "representative of miners who is also an employee of the operator shall suffer no loss of pay during the period of his participation in the inspection made under this subsection." See note 2, *supra*.

This statutory language is susceptible of three possible interpretations, and each of these alternatives has been embraced by one or more of the parties to this controversy.

The mine operators contended below that the only inspections made "pursuant to the provisions of subsection (a)" are the regular inspections required by the specific language of the third sentence of subsection (a). If that construction is correct, the participation of miners in inspections, and the right to be compensated therefor, is limited to these mandatory regular inspections. In the view of the operators, when the Secretary conducts other inspections, including the spot or the electrical inspections at issue

**9.** The Secretary's Interpretive Bulletin, *see* notes 4 and 6, *supra*, makes reference to the conduct of such specialized electrical inspections for purposes of determining the existence of an imminent danger or a violation of the Act. 43 Fed.Reg. 17547 (1978). The decision of the ALJ in the Kentland-Elkhorn case also refers to an MSHA manual which apparently requires such an inspection to be conducted once annually. Adm. Rec. at 50. The record contains no other information about the MSHA manual or any requirements thereunder.

The particular electrical inspection involved in this case happened to occur at the same time that one of the four yearly regular inspections required under section 103(a) was taking place. It was undisputed before the Commission, however, that the electrical inspection was not part

of the regular inspection and that the two were entirely separate.

**10.** The other purposes enumerated in subsection (a), which involve the gathering of information with regard to health and safety standards and conditions, appear to fall under the auspices of the Secretary of Health, Education, and Welfare [now Secretary of Health and Human Services], not the Secretary of Labor. Since the inspections for which miner participation rights are provided in section 103(f) are those conducted by the "Secretary or his authorized representative," and since "the Secretary" is defined for the purposes of the Act to mean the Secretary of Labor (section 3(a), 30 U.S.C. § 802(a)), the information-gathering purposes within the province of HHS do not concern us here.

here, there is no right of either participation or payment.[11]

The approach taken by the Department of Labor, both in its Interpretive Bulletin (see note 6, *supra*) and before this Court, is that any inspection furthering the purposes outlined in subsection (a) is made "pursuant to" the provisions of that subsection, and that the miners are therefore entitled to participate in all such inspections and to do so without loss of pay.

The Commission found the statute not to favor clearly either of these two approaches.[12] To resolve the ambiguity, it searched the legislative history and it there found support for a third alternative: that while the miners have a right to participate in all mine inspections, they are entitled to be paid only for their participation in the regular, mandatory inspections.[13] We will consider first whether the Commission's conclusion can be sustained.

### III

In reaching its decision, the Commission relied exclusively upon a statement by Representative Carl Perkins—a principal sponsor of the 1977 Mine Act, the chairman of the House Committee on Education and Labor during its consideration, and chief conferee for the House when the statute was in conference committee. Congressman Perkins stated on the floor of the House following the adoption by the House-Senate conferees that

[I]t is the intent of the committee to require an opportunity to accompany the inspector at no loss of pay only for the inspections mandated by subsection (a), and not for the additional inspections otherwise required or permitted by the act. Beyond these requirements regarding no loss of pay, a representative authorized by the miners shall be entitled to accompany inspectors during any other inspection exclusive of the responsibility for payment by the operator.[14]

The Commission found

[t]he thrust of Mr. Perkins' statement [to be] that it was the intention of the Senate and House conferees to preserve the right under the 1969 Act to accompany inspector on all inspections, but to accord a walkaround pay right only for regular inspections.[15]

In the opinion of the Commission, Congressman Perkins' statement is the "best guide"

---

**11.** Before this Court, the mine operators contend that the issue to be decided is the scope of the walkaround pay right, and they urge affirmance of the Commission's ruling that compensation is not required for spot inspections. However, the operators do not appear to have abandoned their view that the participation rights themselves are also limited to regular inspections. In any event, the participation rights question is necessarily before us in view of the positions advanced by the other parties.

**12.** The Commission rejected the Secretary's position because it understood that position to permit walkaround and compensation rights with regard to any inspection, in its view rendering meaningless the phrase "pursuant to the provisions of subsection (a)" contained in section 103(f). It also noted that while certain other categories of inspections were specifically authorized elsewhere (see sections 103(g)(1), and 103(i)), the only type of inspection explicitly described in subsection (a) is the mandatory regular inspection of the entire mine. Secretary of Labor v. Helen Mining Co., Docket No. PITT 79–11–P (Nov. 21, 1979), Adm. Rec. at 23.
As for the operators' approach, the Commission concluded that it conflicts with the obvious congressional purpose. Section 103(h) of

the 1969 Mine Act—the predecessor to the present statute—entitled coalminer representatives to accompany inspectors on *any* inspection (although without compensation). Under the construction offered by the mine operators, miners would have fewer walkaround rights under the 1977 Act than the coalminers had under the 1969 Act—a result which the Commission regarded as contrary to the will of Congress. *Id.* at 24.

**13.** Two of the five commissioners dissented, supporting essentially the view espoused by the Department of Labor. Adm. Rec. at 28, 40.

**14.** 123 Cong.Rec. 35410 (1977) (remarks of Rep. Perkins), *reprinted in* Subcomm. of Labor of the Senate Comm. on Human Resources, 95th Cong., 2d Sess., *Legislative History of the Federal Mine Safety and Health Act of 1977* (Comm. Print, 1978) 1358 [hereinafter cited as *Leg. Hist.*].

**15.** Secretary of Labor v. The Helen Mining Co., Docket No. PITT 79–11–P (Nov. 21, 1979), Adm. Rec. at 26.

to the legislative intent on this matter, and as such it is to be given decisive weight.[16]

Although it is certainly true that resort to legislative history is appropriate when the words of a statute are ambiguous,[17] it is equally well-settled that, before resorting to legislative history, a court or administrative body should first look to the language of the law itself to determine its meaning.[18] Committee reports, the statements of committee members, or other legislative materials may generally be considered only in case of ambiguity; they may not be used as a means for construing a statute contrary to its plain terms.[19] Upon examination, it is readily apparent that the Commission's reliance upon the statement of Congressman Perkins has produced a result which is in conflict with an unambiguous requirement of section 103(f), and that it therefore cannot stand.

The phrase "pursuant to the provisions of subsection (a)" in subsection (f) of section 103 may well be ambiguous on the question as to which categories of inspections give rise to participation rights on the part of miners. See Part IV, *infra*. That subsection does state quite unambiguously, however, that whenever a miner *is* entitled to participate in an inspection "pursuant to" subsection (a), he "shall suffer no loss of pay during the period of his participating in the inspection made under this subsection." In other words, under the language of the statute itself the right to walkaround pay is clearly coextensive with the right to accompany the inspector under subsection (f),[20] and there is simply no basis for reading it as supporting the bifurcation of participation and compensation rights espoused in the Commission's decisions.[21]

**16.** *Id.*, at 26–27.

**17.** *United States v. Public Utilities Commission of California*, 345 U.S. 295, 315, 73 S.Ct. 706, 717, 97 L.Ed. 1020 (1952); *Aviation Consumer Action Project v. Washburn*, 175 U.S.App.D.C. 273, 278, 535 F.2d 101, 106 (1976).

**18.** *See, e.g., Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979).

**19.** *See, e.g., Pennsylvania Railroad Co. v. International Coal Mining Co.*, 230 U.S. 184, 199, 33 S.Ct. 893, 397, 57 L.Ed. 1446 (1913); *FTC v. Manager, Retail Credit Co.*, 169 U.S.App.D.C. 271, 278, 515 F.2d 988, 995 (1975); *Committee for Humane Legislation, Inc. v. Richardson*, 414 F.Supp. 297, 308 (D.D.C.1976); 2A *Sutherland Statutory Construction*, § 48.14, p. 220 (4th ed. 1973).

**20.** Of course, this walkaround pay right is subject to the limitation contained in subsection (f) that only one miner representative may accompany an inspector without loss of pay. *See Magma Copper Co. v. Secretary of Labor*, 645 F.2d 694 (9th Cir. 1981). This limitation has nothing to do with the *type* of inspection to be conducted, however; it concerns only the number of miners entitled to walkaround pay on any given inspection.

**21.** The dissent takes us to task for concentrating "on a single sentence" in the Act, and it suggests that the focus should instead be on the statutory structure, history, object, and pol-icy (dissenting opinion, pp. 629, 635–636). But what is at issue is not a mere sentence but the question whether, *on the coextensiveness question*, the statutory language is ambiguous. Subsection (f) provides that

> [miner representatives may accompany federal inspectors] during the physical inspection of any ... mine made pursuant to the provisions of subsection (a) .... Such representative of miners ... shall suffer no loss of pay during the period of his participation in the inspection made under this subsection.

The dissent freely acknowledges that miner representatives have the right to accompany inspectors in all inspections, including those of the spot or special variety (dissenting opinion, pp. 629–630). If that be true—and, like Judge Tamm, we have concluded that it is—it is dispositive of the basic statutory question, for not only is there nothing in subsection (f) to support a distinction between the right to compensation and the walkaround right, but the former is defined by precisely the same reference as the latter. We do not believe it to be an undue fixation on language to follow so plain a mandate and to conclude that whenever miner representatives have the right to accompany they also have the right to be paid.

Moreover, save only for the statement of Representative Perkins, every single reason provided in the dissent for holding that there is no right to compensation with respect to certain inspections would also deny walkaround rights in those same inspections. Judge Tamm relies to a considerable extent on the "pursuant to" phrase in subsection (f) for his conclusion that miner representatives are not entitled to be paid for participation in spot inspections.

The Commission therefore erred in even considering the statement of Congressman Perkins. In any event, that statement was not entitled to the overwhelming weight attributed to it by the Commission, for it could hardly be said to reflect the unambiguous intent of the Congress. Congressman Perkins delivered his statement three weeks after the Senate had completed its consideration of the conference report and had voted passage of the bill,[22] that is, at a time when that body had little or no realistic opportunity to voice its concurrence with or opposition to the gist of his remarks.[23] Thus, whatever weight may properly be attributed to Congressman Perkins' remarks as reflecting the will of the House of Representatives, it did not and could not in any sense be regarded as reflecting that of the Senate.

It is also of significance in this regard that the conference report itself does not, explicitly or by inference, mention the agreement attested to by Congressman Perkins but conveys the quite contrary impression that the broad walkaround pay rights granted by the Senate bill remained unaffected by the changes made by the conference.[24]

In these circumstances, the effect of the Commission's construction would be essentially to permit a single member of one House [25] to alter the meaning of the bill, and effectively to deprive the House that acted first of any real voice in the final meaning of the enactment. That is plainly improper. See *Department of Air Force v. Rose*, 425 U.S. 352, 365–66, 96 S.Ct. 1592, 1601–02, 48 L.Ed.2d 11 (1976); *Jordan v. Department of Justice*, 192 U.S.App.D.C. 144, 158–61, 591 F.2d 753, 767–71 (1978); *Vaughn v. Rosen*, 173 U.S.App.D.C. 187, 193–94, 523 F.2d 1136, 1142–43 (1975); *American Smelting and Refining Co. v. Occupational Safety and Health Review Commission*, 501 F.2d 504, 509–11 (8th Cir. 1974); *Getman v. N.L.R.B.*, 146 U.S.App. D.C. 209, 212 n. 8, 450 F.2d 670, 673 n. 8 (1971); K. Davis, Administrative Law Treatise, § 3A.31, p. 176 (1980 Supp.).

As we said in a similar context in *National Small Shipments Traffic Conference, Inc. v. CAB*, 199 U.S.App.D.C. 335, 344, 618 F.2d 819, 828 (1980):

> But that phrase does not only modify the compensation provisions of the statute; it applies equally to the provisions that deal with walkaround rights. Thus, if the phrase had the broad consequences the dissent ascribes to it, the miner representatives would have neither compensation rights nor walkaround rights in spot inspections—a result everyone agrees to be contrary both to the language of the Act and its legislative history.
>
> As for the broader policies of the statute, they may best be described as the protection of the health and safety of the miners. *See* pp. 626–627 *infra*. These purposes are far more likely to be advanced by a construction which provides walkaround pay in connection with inspections conducted to discover and remedy specific safety hazards than by one which would discourage remedial measures by denying to the miner representatives their regular salaries while attending the necessary inspections.

**22.** The Senate agreed to the conference report on October 6, 1977; Congressman Perkins delivered his speech, and the House agreed to the conference report, on October 27, 1977.

**23.** Commissioner Jestrab, dissenting in *Helen Mining*, noted that there was "no evidence that Congressman Perkins' gloss on section 103(f)

> was ever brought to the attention of or approved by the Senate." Adm.Rec. at 34.

**24.** The report indicates that on the issue of miner representative participation the conference bill "conforms to the Senate bill." H.R. Rep. 655 (Conf.Rep.), 95th Cong., 1st Sess. 45 (1977), *reprinted in Leg. Hist.* at 1323. The Commission itself acknowledged that at the House-Senate conference the "House conferees largely receded and agreed to the Senate bill over the House bill." *Secretary of Labor v. Helen Mining Co.*, Docket No. PITT 79–11–P (Nov. 21, 1979), Adm.Rec. at 27. *See also*, note 30, *infra*.

**25.** To be sure, Congressman Perkins chaired the conference and it has sometimes been said that statements made by one in that capacity may be "regarded as being in the nature of supplemental committee reports and are accorded the same weight as formal committee reports" (2A *Sutherland Statutory Construction*, § 48.14, p. 220 (4th ed. 1973)). But that general proposition is of limited significance where, as here, the substance of the remarks in question was contrary to the statutory provisions and was, at best, implicitly adopted by only one House of Congress.

Courts in the past have been able to rely on legislative history for important insights into congressional intent. Without implying that this is no longer the case, we note that interest groups who fail to persuade a majority of the Congress to accept particular statutory language often are able to have inserted in the legislative history of the statute statements favorable to their position, in the hope that they can persuade a court to construe the statutory language in light of these statements. This development underscores the importance of following unambiguous statutory language absent clear contrary evidence of legislative intent.

■ For the reasons stated, Congressman Perkins' statement was not entitled to decisive weight in the construction of section 103(f), and the Commission's decisions, which wholly depend upon that statement, cannot be upheld.[26]

### IV

Having rejected the Commission's construction of subsection (f), we are left to decide between the remaining two alternatives: (1) that statutory walkaround rights are restricted to regular inspections because they are the only inspections conducted "pursuant to the provisions of subsection (a)," or (2) that walkaround rights arise for any of the physical mine inspections performed for the purposes referred to in that subsection.

Although on this issue the statute is not wholly unambiguous, its language more strongly than not favors the latter interpretation. Certainly, the only type of inspection specifically required by subsection (a) is the mandatory regular inspection, and that

fact supports an argument that the phrase "pursuant to the provisions of subsection (a)" covers these regular inspections and nothing more. We are not persuaded, however, that this construction most faithfully implements either the language enacted by the Congress or the legislative purpose.

The fact is that regular inspections are not the only ones mentioned in the subsection; that provision also directs the Secretary to conduct "frequent [other] inspections" for the purpose of determining "whether an imminent danger exists" and "whether there is compliance with the mandatory health or safety standards." Thus, on the basis of the statutory language alone, it would appear that subsection (f) attaches walkaround rights to all the inspections at issue here.

This conclusion is fortified by the circumstance that several types of inspections are plainly conducted "pursuant to" that subsection (even if they are not specifically required thereby) since they are not authorized by any other provision in the statute. For example, with respect to certain spot inspections—such as the electrical inspection performed in the *Kentland-Elkhorn* case—there is no statutory authorization other than that contained in the general provisions of subsection (a). Thus, if these inspections are valid at all—a conclusion apparently not contested by anyone, including the mine operators—they must have been undertaken "pursuant to the provisions of subsection (a)." More explicit statutory support does exist for some of the other spot inspections (*e.g.*, section 103(i) (gas or other hazardous conditions) or 103(g)(1) (requests of miners)), but here,

---

**26.** Petitioner Secretary of Labor has raised the issue of whether, as a general procedural matter, his interpretation of the Act or that of the Commission is entitled to greater deference on review. The Commission and the Secretary are divided on this issue, although the former does recognize that the standards and regulations promulgated by the Secretary are entitled to "special weight." Secretary of Labor v. Helen Mining Co., Docket No. PITT 79–11–P (Nov. 21, 1979), Adm.Rec. at 22. The Court need not

decide what weight should generally be afforded to a decision by the Commission relative to that given to a conflicting interpretation by the Secretary, since in this instance the Commission's construction is plainly incorrect and unsupportable by the terms of the Act and therefore entitled to no deference. *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). As to the weight to be afforded to the Secretary's interpretation of the Act, *see* p. 626, *infra*.

too, the basic authority [27] for the inspection rests in subsection (a).[28]

The legislative history and other extrinsic aids to statutory construction likewise support the interpretation that all safety inspections are conducted pursuant to subsection (a).

The principal discussion of the two subsections at issue here is found in the report of the Senate Committee on Human Resources dated May 16, 1977 on S. 717,[29] which states that

[f]requent inspections and investigations are authorized under Section 104 for a variety of purposes, such as determining whether or not there is compliance with mandatory health and safety standards or with any requirement of the Act. . . .

Section 104(a) would require that the Secretary of Labor conduct at least four inspections a year of each underground mine in its entirety and two inspections a

year of each surface mine in its entirety. . . . While this provision sets a minimum number of inspections, the Committee notes that the bill also requires the Secretary to increase the number of inspections required based on guidelines which he develops.[30]

This language portrays the yearly regular inspections as the "minimum" number of inspections to be carried out under subsection (a), and it requires the development of guidelines for additional inspections beyond the strict minimum, strongly suggesting that the Senate committee viewed subsection (a) as authority for inspections beyond the regular inspections of the entire mine.[31]

The Senate report further discusses miners' walkaround rights under the bill as follows:

Section 104(e) [32] contains a provision based on that in the Coal Act,[33] requiring

---

**27.** As Commissioner Lawson aptly observed (Adm.Rec. at 41), although a spot gas inspection may be required to be conducted with a certain frequency by subsection (i), it is nevertheless conducted "pursuant to the provisions of subsection (a)" because its purpose is to determine whether an imminent danger exists and whether there is compliance with mandatory health and safety standards.

**28.** It is noteworthy, too, that the right of the Department of Labor to enter a mine without a warrant flows solely from subsection (a), and that this subsection is also the only provision prohibiting the Department from giving the operator advance warning of impending inspections. If only regular inspections were covered by subsection (a), both the entry provision and the warning prohibition would apply only to regular inspections—an absurd result. Compare section 110(e), 30 U.S.C. § 820(e), which imposes criminal penalties on any person giving advance notice of *any* inspection.

**29.** S.Rep.No.181, 95th Cong., 1st Sess. (1977), *reprinted in Leg.Hist.* at 589, U.S.Code Cong. & Admin.News 1977, p. 3401. Section 104(e) of S. 717 contained the same basic text, with insignificant revisions, of what was to become section 103(f) in the final bill. The House bill, H.R. 4287, contained no comparable walkaround pay provision. *See* H.R.Rep.No.655 (Conf.Rep.), 95th Cong., 1st Sess. 45, *reprinted in Leg.Hist.* at 1323.

**30.** *Leg.Hist.* at 614. The statutory language which the report here describes was taken almost verbatim from section 104(a) of S. 717

and placed in section 103(a) of the Act, which now reads as follows:

The Secretary shall develop guidelines for additional inspections of mines based on criteria including, but not limited to the hazards found in mines subject to this chapter, and his experience under this chapter and other health and safety laws.

Both section 104(a) of S. 717 and section 103(a) of the Act require the making of mandatory regular inspections and the development of guidelines for additional inspections. Thus, when the Committee stated in its report that "the bill also requires the Secretary to increase the number of inspections," it was referring to the provisions of subsection (a).

**31.** The House bill, H.R. 4287, did not contain the additional inspections requirement, and the House Committee on Education and Labor did not discuss the inspection provisions of the bill in any great detail. *See* H.R.Rep.No.312, 95th Cong., 1st Sess. (1977), *Leg.Hist.* at 357.

**32.** Section 103(f) of the statute as enacted.

**33.** Section 103(h) of the Federal Coal Mine Health and Safety Act of 1969, Pub.L.No.91–173, 83 Stat. 742 *et seq.*, provided that

At the commencement of any inspection of a coal mine by an authorized representative of the Secretary, the authorized representative of the miners at the mine at the time of such inspection shall be given an opportunity to accompany the authorized representative of the Secretary on such inspection. 83 Stat. 749.

that representatives of the operator and miners be permitted to accompany inspectors in order to asist [sic] in conducting a full inspection. . . . It is the Committee's view that such participation will enable miners to understand the safety and health requirements of the Act and will enhance miner safety and health awareness. To encourage such miner participation it is the Committee's intention that the miner who participates in such inspection and conferences be fully compensated by the operator for time thus spent. To provide for other than full compensation would be inconsistent with the purpose of the Act and would unfairly penalize the miner for assisting the inspector in performing his duties.[34]

There is no reference to the exclusion of some kinds of inspections from the miner participation rights; on the contrary, the report states that the subsection is based on a similar provision in the Coal Act, which allowed for miner accompaniment of inspectors on all inspections. See note 34, *supra.* It is also apparent from this language that miner participation in inspections, and full compensation therefor, were considered by the committee to constitute important tools in the effort to increase miners' awareness of the hazards they face and the measures they can take to achieve a safe and healthy working environment.

The importance of this factor was underscored by a colloquy between Senators Helms and Javits on the Senate floor, "the only extended discussion of walkaround pay" contained in the legislative history. *Magma Copper Co. v. Secretary of Labor, supra,* 645 F.2d at 697. Senator Helms introduced an amendment to S. 717 that would have stricken any reference to walkaround pay. Senator Javits successfully opposed the amendment, giving the following reasons:

First, greater miner participation in health and safety matters, we believe, is essential in order to increase miner awareness of the safety and health problems in the mine, and secondly, it is hardly to be expected that a miner, who is not in business for himself, should do this if his activities remain uncompensated.

In addition, there is the general responsibility on the operator of the mine imposed by the bill to provide a safe and healthful workplace, and the presence of miners or a representative of the miners accompanying the inspectors is an element of the expense of providing a safe and healthful workplace. . . .

One of the things we found at the hearing, Mr. President, that all the witnesses agreed to, is that miners' safety consciousness need [sic] to be materially improved. . . .

But we cannot expect miners to engage in the safety-related activities if they are going to do without any compensation, on their own time. If miners are going to accompany inspectors, they are going to learn a lot about mine safety, and that will be helpful to other employees and to the mine operator.

In addition, if the worker is along he knows a lot about the premises upon which he works and, therefore, the inspection can be much more thorough. We want to encourage that because we want to avoid, not incur, accidents. So paying the worker his compensation while he makes the rounds is entirely proper.[35]

There is, we think, no reasonable basis for concluding that Congress intended to grant broad walkaround rights to miner representatives for routine inspections but to deny such rights with respect to inspections conducted to deal with specific safety hazards.[36] So paradoxical a purpose should not

---

**34.** S.Rep.No.181, 95th Cong., 1st Sess. 28–29 (1977), *reprinted in* Leg.Hist. at 616–17, U.S. Code Cong. & Admin.News 1977, p. 3401.

**35.** 123 Cong.Rec. 20019–20 (1977), *reprinted in* Leg.Hist. at 1054.

**36.** Indeed, under the Commission's interpretation, a miner who requests a special inspection under 103(g)(1) (*see* note 4, *supra*) would not be paid for participating in the inspection in order personally to show the condition to the inspector or to explain why it is dangerous.

be imputed to the Congress without very strong evidence that this was its intent. As indicated, not only is there no such evidence, all indications are to the contrary.[37]

We must also bear in mind that "safety legislation is to be liberally construed to effectuate the congressional purpose,"[38] and that the construction of these provisions contained in the Interpretive Bulletin of the Secretary of Labor[39] "is entitled to deference unless it can be said not to be a reasoned and supportable interpretation of the Act."[40] The Court of Appeals for the

Ninth Circuit—the only other Circuit to have interpreted section 103(f)[41]—has aptly noted that "[t]he walkaround pay provision and the participation right are both aimed at the protection of the health and safety of miners—the single overriding purpose of the legislation." *Magma Copper Co. v. Secretary of Labor, supra,* 645 F.2d at 698.

Given the broad health and safety purpose underlying the Act in general[42] and the miners' walkaround rights in particular, as well as the absence of significant support either in the statutory language[43] or the

**37.** A principal impetus for enactment of the current statute was the then recent Scotia mine disaster in which a number of miners and several federal inspectors were killed as a result of two explosions of accumulated methane gas. *See Leg.Hist., e.g.,* at 87, 592–93, 596. Yet the Commission's decision in the *Helen Mining Co.* and *Allied Chemical Corp.* cases would have the effect of denying compensation to miners' representatives for time spent in spot methane inspections.

**38.** *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 13, 100 S.Ct. 883, 891, 63 L.Ed.2d 154 (1980); *United States v. Bacto-Unidisk,* 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969); *Lilly v. Grand Trunk Western Railroad Co.,* 317 U.S. 481, 486, 63 S.Ct. 347, 351, 87 L.Ed. 411 (1943); *Magma Copper Co. v. Secretary of Labor, supra,* 645 F.2d at 696–97; *District 6, United Mineworkers of America v. United States Department of Interior Board of Mine Operations Appeals,* 183 U.S.App.D.C. 312, 317, 562 F.2d 1260, 1265 (1977).

**39.** 43 Fed.Reg. 17546 (1978). *See* note 6, *supra,* for a summary of the Bulletin's contents.

**40.** *Magma Copper Co. v. Secretary of Labor, supra,* 645 F.2d at 696, *quoting Whirlpool Corp. v. Marshall, supra,* 445 U.S. at 11, 100 S.Ct. at 890. *See also* the Senate committee report on S. 717, which states that

[s]ince the Secretary of Labor is charged with responsibility for implementing this Act, it is the intention of the Committee, consistent with generally accepted precedent, that the Secretary's interpretation of the law and regulations shall be given weight by both the Commission and the courts.

S.Rep.No.181, 95th Cong., 1st Sess. 49 (1977), *reprinted in Leg.Hist.* at 637.

Intervenor Kentland-Elkhorn Company contends that the Interpretive Bulletin is invalid due to the Secretary's failure to comply with the rulemaking procedures mandated by the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* It is clear, however, that under *Chamber of Commerce v. OSHA,* 204 U.S.App.D.C.

192, 196–97, 636 F.2d 464, 468–69 (1980), this bulletin constitutes an interpretive, not a legislative rule, since it seeks to explain and construe the walkaround pay rights contained in section 103(f) rather than to supplement the Act by imposing new obligations or granting new rights. It is, accordingly, exempted from APA rulemaking procedures. *See* 5 U.S.C. § 553(b)(3)(A).

**41.** The issue before the Ninth Circuit was not whether miners would be compensated for non-regular inspections, but rather whether, on an inspection for which there were several inspectors, one miner per inspector was required to be paid for his walkaround time. In line with the safety purposes of the Act, the court held that one miner per inspector was entitled to compensation. *Magma Copper Co. v. Secretary of Labor, supra,* 645 F.2d at 698–99.

**42.** The current statute was the product of serious legislative concern about health and safety hazards in the nation's mines and their alarming death and injury toll. *See, e.g.,* H.R.Rep. No.312, 95th Cong., 1st Sess. 3 (1977), *reprinted in Leg.Hist.* at 359; 123 Cong.Rec. 23161 (1977) (remarks of Rep. Gaydos), *reprinted in Leg.Hist.* at 1172.

**43.** It is true that our choice of the Secretary's interpretation of section 103(f) over those of the mine operators and of the Commission is not entirely unflawed. The issue would be beyond debate if several types of inspections had not been described in provisions other than section 103(a) and if that subsection had not included both specific and general inspection authority. *See* note 12, *supra; Secretary of Labor v. Helen Mining Co.,* Docket No. PITT 79–11–P (Nov. 21, 1979), Adm.Rec. at 23. But we are, of course, required to interpret the statute as Congress wrote it, not as we wished it might have been written so as to remove all possible ambiguities. Among the three possible interpretations only that of the Secretary both avoids outright conflict with the plain

legislative history for an interpretation narrowing those rights to the minimum number of inspections required by section 103(a), we are constrained to reject the construction of the Act that could limit miners' entitlement to walkaround pay to these regular inspections. We agree with the Secretary that under section 103(f) miner representatives are entitled to walkaround pay rights with respect to any physical inspection of a mine carried out under Department of Labor auspices for the purpose of determining "whether an imminent danger exists," or "whether there is compliance with the mandatory health or safety standards or with any citation, order, or decision issued under this subchapter or other requirements of this chapter."[44]

## V

█ It is clear from the record before us that the electrical inspection and the inspections of excessive liberation of methane gas in question in these cases were performed not for information-gathering, research, or educational purposes,[45] but for determining the existence of imminent dangers and for monitoring compliance with the mandatory safety and health standards under the Act. Accordingly, the miner representatives who accompanied the inspectors are entitled to be paid for the time spent participating in the inspections.

The decisions of the Commission are reversed, and the cases are remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

WALD, Circuit Judge, concurring:

Judge Tamm's dissent suggests a conflict between the panel opinion's treatment of Representative Perkins' remarks and my treatment of remarks by a conference committee member in an altogether different case. *See* p. 626 n.41 (Tamm, J., dissenting) (*comparing* pp. 620–623 *with Demby v. Schweiker,* 671 F.2d 507, at 516–517 & n.11 (D.C.Cir. Dec. 15, 1981) (Wald, J., dissenting)). I do not perceive any such conflict. In *Demby,* the majority relied on an ambiguous table in a conference report to negate the clearly expressed intent of *both* the House and Senate. Dissenting from that opinion, I wrote that the conference committee report was completely consistent with the committee reports issued by the two Houses, and that we should not lightly presume that the conference committee stepped outside its mandate to resolve differences. I then noted that this reading of the conference committee's actions was confirmed by the remarks of Senator Schmitt, a conference committee member.

In contrast, the panel's interpretation of subsection 103(f) in this case is supported by the plain language of the statute as well as by relevant committee reports. *See* pp. 623–627. Therefore, I see no reason to give Representative Perkins' remarks incorporating a different interpretation "decisive" weight. I concur in the panel's opinion.

TAMM, Circuit Judge, dissenting:

I must respectfully dissent. Although I recognize the attractiveness of the majority's result, I believe it impermissibly crosses the line that divides construction of a statute to effectuate the will of Congress from construction intended to achieve the preferable policy conclusion. Indeed, there are aspects of the majority opinion one might be inclined to take *cum grano salis* in light of the language Judge Greene employs. While rejecting the result reached by three of five Commissioners of the Federal Mine

terms of the statute and conforms to the health and safety purpose underlying the Act, and it is therefore the one to be preferred.

**44.** Activities conducted for other purposes that might be labeled "inspections"—for example, the information-gathering investigations to be conducted under HHS auspices (*see* note 10,

*supra*)—do not give rise to walkaround rights. *See* the Secretary's Interpretive Bulletin, *supra,* 43 Fed.Reg. at 17548, for a listing of the types of activities which do not give rise to such rights.

**45.** *See* note 44, *supra.*

Safety and Health Review Commission (Commission) and two of the three administrative law judges who ruled on the issue, the majority offers in acknowledgment of possible contrary interpretations of the provisions in question only the grudging concession that the statute "is not wholly unambiguous...."[1] I believe that the Commission's construction of the relevant sections of the Federal Mine Safety and Health Act of 1977 (FMSA)[2] is the one most consonant with the intent of Congress, and I would accordingly affirm the Commission's rulings in these cases.

## I.

As the majority correctly notes, the central question we face today is whether under the FMSA miner representatives who accompany federal officials on inspection tours are entitled to the payment of their regular wages for the time spent away from their normal work. The resolution of this question turns on the construction of two subsections of the FMSA that, *inter alia*, authorize the Secretary of Labor to conduct certain mine inspections and require mine operators to compensate with their regular wages the miner representatives who accompany the Secretary's inspectors.

The provision of the FMSA that sets forth the obligation of operators to permit miner representatives to accompany inspectors and to provide "walkaround pay" is subsection 103(f).[3] In pertinent part, the subsection states:

> Subject to regulations issued by the Secretary, a representative of the operator and a representative authorized by his miners shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any coal or other mine *made*

**1.** Majority opinion (maj. op.) at 623.

**2.** 30 U.S.C. §§ 801–962 (1976 and Supp. II 1978).

**3.** 30 U.S.C. § 813(f) (Supp. II 1978).

**4.** 30 U.S.C. § 813(a) (Supp. II 1978).

*pursuant to the provisions of subsection (a) of [section 103]....* Such representative of miners who is also an employee of the operator shall suffer no loss of pay during the period of his participation in the inspection made under this subsection.

30 U.S.C. § 813(f) (Supp. II 1978) (emphasis added). Subsection 103(a)[4] in turn requires the Secretary of Labor to conduct inspections for certain stated purposes. It provides, again in pertinent part:

> Authorized representatives of the Secretary ... shall make frequent inspections and investigations in coal or other mines each year for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments originating in such mines, (2) gathering information with respect to mandatory health or safety standards, (3) determining whether an imminent danger exists, and (4) determining whether there is compliance with the mandatory health or safety standards or with any citation, order, or decision issued under this subchapter or other requirements of this chapter.... *In carrying out the requirements of clauses (3) and (4) of this subsection, the Secretary shall make inspections of each underground ... mine in its entirety at least four times a year, and of each surface ... mine in its entirety at least two times a year.*

30 U.S.C. § 813(a) (Supp. II 1978) (emphasis added).

In a thoughtful, detailed opinion, the Commission held that the interplay of these two subsections requires that mine operators provide walkaround pay only for the "regular"[5] mine inspections mandated by

**5.** "Regular" inspections are inspections of the entirety of a mine specifically mandated by § 103(a) of the Federal Mine Safety and Health Act of 1977 (FMSA), 30 U.S.C. § 813(a) (Supp. II 1978). Regular inspections are to be distinguished from "spot" inspections that are conducted for certain special purposes and are generically separate from regular ones. These additional inspections may be authorized by

subsection 103(a). *Secretary of Labor v. Helen Mining Co.*, Docket No. PITT 79–11–P (Nov. 21, 1979), Appendix (App.) at 17. Although miner representatives are entitled, according to the Commission, to accompany federal investigators during most "spot" [6] inspections, the mine operators are not obligated to supply walkaround pay to the miner representatives for those inspections. Rejecting the more extreme viewpoints of the mine operators on one hand and the Secretary of Labor on the other,[7] the Commission found support for its construction of the FMSA in the language of the statute and in the remarks of Representative Carl Perkins, the chairman of the House committee that drafted the House bill and the chief House conferee on the FMSA.[8]

### II.

Although somewhat more complex rhetoric is employed, the majority's rejection of the Commission's analysis in *Helen Mining Co.* is predicated fundamentally on a neat syllogism:

(1) As the right to walkaround pay under the FMSA is "clearly coextensive" with the right to accompany federal inspectors on investigative tours;[9] and

(2) As the Congress could not possibly have intended to cut back on the pre-existing right of miner representatives to accompany federal inspectors during *all* mine inspections;[10]

*Q.E.D.*—Miner representatives are entitled to walkaround pay for all such inspections, and not only for the regular ones mandated by subsection 103(a).

Although the matter is not, strictly speaking, before the court, I tend to agree with the majority's "principle 2": in light of the broad safety goals of the FMSA, it is unlikely that the draftsmen intended to circumscribe miner rights that antedated the Act. As the majority notes, miner representatives were entitled to accompany federal inspectors during *all* inspections under the mining legislation that preceded the FMSA.[11] Subsection 103(h) [12] of the Federal Coal Mine Health and Safety Act of 1969 provided that an authorized miner representative was permitted to accompany federal investigators during all mine inspections, and the Report that accompanied the Senate version of the current FMSA specifically acknowledged the connection between the 1969 provision and the new one.[13] There is no suggestion either in the FMSA itself or in the legislative history that the draftsmen intended to limit walkaround rights, and I agree with the majority and the Commission that the 1977 statute did not achieve this result.

---

specific statutory provisions. *See, e.g.*, 30 U.S.C. § 813(i) (Supp. II 1978) (spot inspection required every five days in mines that liberate excessive amounts of methane gas).

The distinction between "regular" and "spot" inspections is not explicitly set forth in the FMSA. The distinction is, however, generally recognized by federal administrators, mine operators, and miner groups.

**6.** *See* note 5, *supra.*

**7.** The Secretary of Labor argued before the Federal Mine Safety and Health Review Commission and contends before this court that *any* inspection promoting the purposes noted in the first sentence of § 103(a) is one made "pursuant to" that subsection, and hence, that all or most spot inspections give rise to a compensation right in accompanying miner representatives. *See, e.g., Secretary of Labor v. Helen Mining Co.*, Docket No. PITT 79–11–P (Nov. 21, 1979) at 3; Appendix (App.) at 19. The mine operators contended that *neither* a compensa-

tion *nor* a walkaround right existed for inspections other than regular ones, for only regular inspections were conducted "pursuant to" § 103(a). *See, e.g., id.* at 8; App. at 24. The operators do not vigorously press before us, however, this limitation on walkaround rights. *See, e.g.*, Brief for Intervenor-Respondent Helen Mining Company at 20 n.11.

**8.** *Helen Mining Co.* at 8–11; App. at 24–27.

**9.** *See* maj. op. at 621.

**10.** *See id.* at 625.

**11.** *Id.* at 624–625.

**12.** 30 U.S.C. § 813(h) (1976) (repealed).

**13.** S.Rep.No.181, 95th Cong., 1st Sess. 28–29 (1977) U.S.Code Cong. & Admin.News 1977, p. 3406. *See* maj. op. at 624–625 nn. 33–34.

I part ways with the majority, however, when we turn to "principle 1." I do not believe that the FMSA inextricably links miner compensation rights with walkaround rights, and I respectfully submit that the reasoning the majority employs to deduce that link is simplistic. The majority opinion contends that there can be no "bifurcation of participation and compensation rights"; [14] the two must stand or fall together. I believe, however, that the majority's conclusion in this regard is the product of a myopic concentration on a single sentence in the FMSA and a concomitant failure to take adequate account of the structure and history of the Act.

My major criticism of the majority opinion centers on what I believe is its objectionable methodology. The majority recognizes that there are three ways to read the relevant language in subsection 103(f). [15] The opinion then dismisses the Commission's interpretation of that subsection by focusing narrowly on the sentence that establishes compensation rights, and by glossing over the ambiguities that pervade the subsection *as a whole*. This is a deft strategy, for it permits the court to eliminate the plausible middle ground position of the Commission; instead, the court is left with two alternatives, one of which may easily be eliminated in light of its clear inconsonance with the aims of the FMSA and with the statutory predecessors of that Act. [16]

Let us, however, turn this methodology around and begin the analysis by determining the compensation rights of the miner representatives, for it is those rights that are properly at the center of this litigation. [17] The relevant language in subsection 103(f) provides that such a representative "shall suffer no loss of pay during the period of his participation in [inspections] made under this subsection." 30 U.S.C. § 813(f) (Supp. II 1978). The inspections made under "this subsection" are, in turn, the "physical inspection[s] of any coal or other mine made pursuant to the provisions of subsection (a) of [section 103]...." *Id.* Thus, the question we must resolve is *which* inspections are made "pursuant to the provisions of subsection (a)...."

This issue is not a simple one to resolve, though in my opinion the better view is the one adopted by the Commission in *Helen Mining Co.* Although there is language in subsection 103(a) that speaks of "frequent inspections" for certain general purposes, the only type of inspection specifically mandated by that provision is the regular inspection of the entire mine. It is beyond cavil that only two of the four sets of purposes [18] for which mine inspections are to be conducted fall under the aegis of the Secretary of Labor, and as to those purposes, subsection (a) states that "the Secretary shall make inspections of each underground ... mine in its entirety at least four times a year...." [19] Accordingly, the logic of the language of subsection 103(a) itself would lead me to conclude, as it did the Commission, that the only inspections made "pursuant to" that subsection are the regular ones.

14. Maj. op. at 621.

15. *Id.* at 619.

16. As I suggested above, *see* pp. 617–618, it is clear both from the structure of the FMSA and its legislative history that Congress did not intend to eliminate the all-inclusive walkaround right that antedated the FMSA. I do not believe, however, in contrast to the majority, that the question of the proper scope of walkaround rights is properly before this court. The issue in this case is only the scope of the walkaround pay provision.

17. *See* note 16, *supra*.

18. As the majority notes, two of the four sets of purposes enumerated in § 103(a) fall under

the investigatory domain of the Secretary of Health and Human Services. Maj. op. at 9 n.10. Specifically, the information-gathering purposes set forth under numbers (1) and (2) of § 103(a) are within the aegis of the Health and Human Services Secretary. By contrast, the Secretary of Labor is directed by § 103(a) to conduct inspections to determine "whether an imminent danger exists" and "whether there is compliance with the mandatory health or safety standards" or with other administrative orders promulgated under relevant legislation. 30 U.S.C. § 813(a) (Supp. II 1978).

19. *Id.*

This conclusion is fortified when we step back and examine in detail the structure and history of the FMSA. Put most simply, the majority's construction of the "pursuant to" language renders that whole phrase substantively meaningless in the context of subsection (f). If Congress had intended that subsection 103(a) was to constitute the general authorization for all inspections—and, hence, that the "pursuant to" language brought within its ambit all inspections—then it strikes me as peculiar that the simple and inclusive language "any inspection" was not used in subsection 103(f). As the Commission noted,[20] the argument adopted by today's majority fails to explain why Congress *altered* the general "any inspection" language used in the walkaround provision of the 1969 mine safety statute.[21] The draftsmen of the FMSA were clearly aware of the phrase; indeed, they employed it no fewer than six times in related provisions of the Act to denote general powers or authorizations of general applicability.[22] Clearly, the "pursuant to" language was intended to have a *limiting effect* that the majority simply reads out of the statute.

The weaknesses in the majority's construction of the FMSA are further evident upon examination of the various types of inspections provided for in provisions *other* than subsection 103(a). "Special" or "spot" inspections are mandated by several other sections of the FMSA;[23] the inspection in *Helen Mining Co.* was such a "spot" inspection.[24] It is true, as the majority notes, that there are inspections conducted by the Secretary of Labor that are neither regular nor specifically authorized by another provision.[25] Yet to me, this fact does not lead to the conclusions drawn by the majority that the "basic authority" for virtually *all* inspections is subsection 103(a) and that all inspections are thereby conducted "pursuant to" that provision.[26] Rather, I find persuasive the Commission's observation that, even if all inspections could be conducted for one of the purposes in subsection (a), the "pursuant to" language "was intended to accord the right to walkaround pay to the only inspection specifically and exclusively described in section 103(a)—the regular inspection."[27]

To be sure, no law professor will ever use the FMSA as a model of draftsmanship;

**20.** *Helen Mining Co.* at 7; App. at 23.

**21.** The walkaround right under the 1969 mine legislation was contained in § 103(h). That subsection provided:

At the commencement of *any inspection* of a coal mine by an authorized representative of the Secretary, the authorized representative of the miners at the mine at the time of such inspection shall be given an opportunity to accompany the authorized representative of the Secretary on such inspection.

30 U.S.C. § 813(h) (1976) (repealed) (emphasis added).

**22.** *See* § 103(a), 30 U.S.C. § 813(a); § 103(g)(2), 30 U.S.C. § 813(g)(2); § 104(d)(1), 30 U.S.C. § 814(d)(1); § 104(e)(1), 30 U.S.C. § 814(e)(1); § 104(g)(1), 30 U.S.C. § 814(g)(1); § 107(a), 30 U.S.C. § 817(a).

**23.** Subsection 103(g)(1) of the FMSA requires the Secretary of Labor to conduct an inspection if a miner or miner representative has reasonable grounds to believe that a violation of the FMSA or an imminent danger to health or safety exists and so notifies the Secretary. 30 U.S.C. § 813(g)(1) (Supp. II 1978). A spot inspection at stated intervals is required by § 103(i) of mines that liberate excessive quantities of explosive gases or at which other espe-

cially hazardous conditions exist. 30 U.S.C. § 813(i) (Supp. II 1978). Subsection 202(g) authorizes the Secretary of Health and Human Services to conduct spot inspections to ensure compliance with the health standards in Title II of the FMSA. 30 U.S.C. § 842(g) (Supp. II 1978). Finally, § 303(x) requires the Secretary of Labor to inspect an inactive or abandoned mine prior to the recommencement of mining operations. 30 U.S.C. § 863(x) (Supp. II 1978).

**24.** The inspection at issue in *Helen Mining Co.* was a spot check pursuant to subsection 103(i) of the FMSA of a mine that had been found to liberate an excessive quantity of methane. *Helen Mining Co.* at 1; App. at 17.

**25.** As the majority notes, maj. op. at 623–624, certain nonregular inspections, such as the electrical inspection at issue in *Kentland-Elkhorn Coal Corp. v. Secretary of Labor*, Docket No. PIKE 78–399 (Nov. 30, 1979); App. at 59, are not specifically authorized by a provision of the FMSA.

**26.** *See* maj. op. at 624.

**27.** *Helen Mining Co.* at 7; App. at 23.

the confusing interrelationship of general and specific authorizations of inspections renders the determination of the scope of the walkaround pay right a most difficult one. Hence, resort to relevant legislative history is perforce appropriate. The majority opinion takes note of several observations made by committees of the Congress or by individual members on the floor that demonstrate the importance attached to miner participation in inspections and walkaround pay.[28] These observations are irrefutable, but they are at best marginally relevant to the question posed by these cases, which is the scope of the walkaround pay right. As the intervening mine operators note, the nonprovision of walkaround pay in cases of spot inspections is not inconsistent with the safety and health aims that underlie the FMSA.[29] Spot inspections are typically highly technical in nature and limited in time and scope; it is clear that the Congress could quite reasonably have decided that walkaround pay was not needed as an incentive to encourage miner participation in these sorts of inspections.

There is, admittedly, little in the legislative record on the specific question of walkaround pay. As the Commission noted,[30] the House and Senate bills considered at Conference diverged in their walkaround pay provisions; the Senate bill included a walkaround pay provision attaching to the physical inspections of mines "under subsection (a)," while the House bill simply continued the walkaround rights of miners under the 1969 legislation without the provision of compensation for the time so expended.[31] The written report of the conferees stated that "[t]he conference substitute conforms to the Senate bill."[32] The relevant language was, however, changed from that noted above to the "pursuant to" language of subsection 103(f), without additional comment.[33]

No member of the Senate made relevant observations on the scope of the right to walkaround pay after the Conference.[34] One member of the House did, however, address this issue specifically and unambiguously. Representative Carl Perkins, chief sponsor of the House version of the FMSA and chief House conferee, made the customary oral report to the House setting forth the details of the Conference substitute. Given the unambiguous and unconditional nature of his remarks, they are worth quoting at some length:

> Mr. Speaker, before concluding my remarks I would like to address one aspect of the conference report that seems to be somewhat ambiguous.
>
> *     *     *     *     *     *
>
> Section 103(f) provides that a miners' representative authorized by the operator's miners shall be given an opportunity to accompany the inspector during the physical inspection and pre- and post-inspection conferences pursuant to the provisions of subsection (a). Since the conference report reference is limited to the

---

**28.** *See* maj. op. at 624–625.

**29.** Brief for Intervenor-Respondent Helen Mining Company at 20–23; Brief for Intervenor-Respondent Kentland-Elkhorn Coal Corporation at 21–23.

**30.** *Helen Mining Co.* at 8; App. at 24.

**31.** *Compare* S. 717, § 104(e), 95th Cong., 1st Sess. (1977), *reprinted in* Subcommittee on Labor of the Senate Committee on Human Resources, 95th Cong., 2d Sess., Legislative History of the Federal Mine Safety and Health Act of 1977, at 1115 (1978) [hereinafter Leg.Hist.], *with* H.R. 4287, 95th Cong., 1st Sess. (1977), *reprinted in* Leg.Hist. at 1178–82, *reprinted as substituted for the Senate bill*, Leg.Hist. at 1260–75.

**32.** Conference Report on the Federal Mine Safety and Health Amendments Act of 1977, S.Rep.No.461, 95th Cong., 1st Sess. 45 (1977), *reprinted in* Leg.Hist. at 1323.

**33.** The majority summarily opines that this revision was "insignificant," and then deals with it no further. Maj. op. at 20 n.29. I find this approach surprising—and a bit disingenuous—since the Commission clearly felt that the change was significant. *See Helen Mining Co.* at 8; App. at 24. Even if the members of the majority disagree with the Commission on this point, it would seem preferable to confront more forthrightly the change of language than to dismiss it in a footnote as "insignificant."

**34.** *See Helen Mining Co.* at 10; App. at 26.

inspections conducted pursuant to section 103(a), and not to those pursuant to section 103(g)(1) or 103(i), the intention of the conference committee is to assure that a representative of the miners shall be entitled to accompany the Federal inspector, including pre- and post-conferences, at no loss of pay *only during the four regular inspections of each underground mine and two regular inspections of each surface mine in its entirety,* including pre- and post-inspection conferences.

\*     \*     \*     \*     \*     \*

Since the conference report does not refer to *any inspection,* as did section 103(h) of the 1969 act, but, rather to an inspection of any mine pursuant to subsection (a), it is the intent of the committee to require an opportunity to accompany the inspector at no loss of pay only for the regular inspections mandated by subsection (a), and *not* for the additional inspections otherwise required or permitted by the act. Beyond these requirements regarding no loss of pay, a representative authorized by the miners shall be entitled to accompany inspectors during any other inspection exclusive of the responsibility for payment by the operator.[35]

It is apparent, as the Commission noted, that Representative Perkins believed that the conferees intended "to preserve the right under the 1969 Act to accompany the inspector on all inspections, but to accord a walkaround pay right only for regular inspections."[36]

The majority discounts, as it must to preserve its position, the remarks of Representative Perkins. Judge Greene's first complaint with them is that the statute is so clear and Representative Perkins so off the mark that the comments may not even be considered. Although I will address later

this ostrich-like use of the plain language doctrine,[37] suffice it here to say that I find it difficult to believe that any objective reader could fail to conclude that subsections 103(a) and (f) are so ambiguity-ridden as to call out for clarification.

Turning to the matter of the proper weight to be accorded Representative Perkins' statement, the majority faults the Commission for attributing "overwhelming weight" to the remarks.[38] Citing the usual litany of authorities employed to explain away the contradictory comments of a legislator, the majority effectively reads Mr. Perkins' observations out of the record; far from attributing any significant weight to his remarks, the majority attaches no weight to them whatsoever.

I share the Commission's view, however, that Representative Perkins' remarks are the best index of congressional intent in this case. He was, of course, not simply stating his personal viewpoint on the construction of subsection 103(f); he was, rather, conveying his understanding of the intention of *both* the House and Senate conferees on the agreed-upon meaning of the revised walkaround pay provision. As the Commission noted, Mr. Perkins' statement was detailed, unambiguous, and uncontradicted, and was delivered "solely to inform the House of the conferees' agreement."[39]

How, then, does the majority avoid the otherwise devastating thrust of Representative Perkins' statement? It does so largely through adoption of a blindly chronological approach: because the Perkins statement was delivered three weeks after the Senate had acted on the Conference substitute, his remarks could not "in any sense" be regarded as reflecting the will of the Senate.[40] That conclusion, any way one examines it, is flatly wrong. It is, to begin with, wrong as a matter of fact; Mr. Perkins was attempting to explain to a confused House

---

**35.** 123 Cong.Rec. 35,410 (daily ed. Oct. 27, 1977) (remarks of Rep. Perkins, *reprinted in* Leg.Hist. 1356–58) (emphasis added).

**36.** *Helen Mining Co.* at 10; App. at 26.

**37.** *See* pp. 635–636, *infra.*

**38.** Maj. op. at 622.

**39.** *Helen Mining Co.* at 10; App. at 26.

**40.** Maj. op. at 622.

what the conferees perceived the meaning of subsection 103(f) to be. By definition, some of the conferees were from the Senate, and, though hardly dispositive, not one of them has ever taken issue with Representative Perkins' remarks. Thus, the Congressman's statement might well reflect precisely the will of the Senate conferees— that the Senate had already voted on the Conference substitute is irrelevant in evaluating the significance of Mr. Perkins' perception of the understandings reached at the Conference.

Second, the majority's chronological observations prove a bit too much. There are, we should remember, two Houses of Congress, and Representative Perkins made his remarks at a crucial stage in the House deliberations on the FMSA. As such, we must assume that his remarks were familiar to the representatives and influenced their voting decisions on the Conference bill. Accordingly, we have a situation in which, at the very least, one House of Congress has acted on the basis of a certain understanding of statutory language. It would seem incumbent on the majority to respond directly in refutation of Representative Perkins' remarks, instead of using maxims of statutory construction to dodge difficult issues. Indeed, I find this reluctance to accord any weight to Representative Perkins' remarks puzzling in light of a recent observation made by a member of today's majority on a similar matter of construction.[41]

The majority also dismisses Mr. Perkins' statement on the ground that acceptance of it would permit the views of a single legislator to alter unilaterally the "meaning of the bill."[42] I find this objection somewhat peculiar, inasmuch as it is rather clear that in the congressional process one House *always* acts first; by so acting, the chamber that first takes action does *not* deprive the other of the right to hold meaningful views on the construction properly accorded the statutory language. The two Houses of Congress often act independently, and the views of one body do not bind the legislators in the second. Each member of both Houses has the opportunity to comment on pending provisions, and statements so made are entitled to weight regardless of their chronological order.

Finally, the majority's citation of *National Small Shipments Traffic Conference, Inc. v. CAB*, 618 F.2d 819, 828 (D.C.Cir.1980), is inapposite. This is not a case in which an "interest group" has succeeded in having a self-serving statement inserted in some oblique corner of the legislative record; rather, we have the leading House sponsor of the proposed legislation commenting on the meaning he believes the Conference members ascribed to certain language.

Having considered the majority's analysis of the weaknesses of Representative Perkins' statements, let us consider briefly why the Commission ruled that his remarks should be given considerable weight in this process of construction. First, Representative Perkins hardly made his remarks as the quintessential uninvolved, "single legislator"; rather, he acted as chairman of the

41. In her dissent in *Demby v. Schweiker*, 671 F.2d 507 (D.C.Cir. 1981), Judge Wald relied heavily on the subsequent remarks of a member of a congressional conference committee to explain what was done at the conference. Indeed, the similarity between the factual situation in that case and ours today and between her observations there and mine now is striking. *See id.*, at 516–517 & n.11 (Wald, J., dissenting). She noted that her interpretation of the provisions in question was "supported by the only piece of legislative history we have about the meaning of the Conference Report." *Id.* at 516. The relevant congressional remarks were made by Senator Schmitt, whom she noted "had a special concern with the compromise struck by the confer-

ees, and his remarks offered a comprehensive account of [the subject matter]. . . ." *Id.* But most interesting are her observations on the weight properly attached to Senator Schmitt's statements:

Obviously, his statement is not conclusive evidence of Congressional intent, but neither can it be totally ignored as the contemporaneous expression of the Senate Conference Committee member most involved with and knowledgeable about the program items involved in this case.

*Id.* at 517. I could not agree more with this assessment.

42. Maj. op. at 622.

House committee that reported the bill and as leader of the House conferees who participated in its revision. Mr. Perkins was the chief House conferee and as such was intimately familiar with the legislation; his statement was made on the basis of his understanding of the intentions of both the House and Senate members of the Conference. It is well-established that statements on the floor by the committee member in charge of a bill "are regarded as being in the nature of supplemental committee reports and are accorded the same weight as formal committee reports." [43] Mr. Perkins' remarks fit squarely in this category, and the majority's conclusory attempt to diminish their significance plainly fails.

Second, we should not forget the role played by Representative Perkins in the area of mine safety and health regulation. As the Commission noted in *Helen Mining Co.*, Mr. Perkins has for many years been a leader in this field, and was a principal sponsor of both the 1969 and 1977 mine safety bills.[44] As such, the majority's attempt, in effect, to contradict Mr. Perkins on this score is somewhat akin to art critics attempting to explain to Michelangelo the "meaning" of the scenes on the ceiling of the Sistine Chapel.

By way of summary, I believe that Representative Perkins' remarks were properly weighted by the Commission. His statement was clear, directly on point, and prepared with great care; equally important, there is not the slightest contradiction of the details of his remarks at any place in the legislative history.

### III.

We come, then, to the final and critical issue in this case: is the majority correct in its use of the plain language doctrine to reject the Commission's "middleground" construction of the FMSA? As a threshold

matter, I believe that the majority fails to accord sufficient deference to the interpretation given by the Commission to the statute it has been charged to interpret. The Congress clearly *divided* the lawmaking and policymaking functions between the Secretary of Labor and the Commission, and it is apparent that some deference is owed a decision of the Commission even when it diverges from the position of the Secretary. The analogy noted by the Commission between the policymaking structure under the FMSA and that under the Occupational Safety and Health Act (OSHA) is distinct, and cases articulating the relationship between the Secretary of Labor and the Occupational Safety and Health Review Commission are accordingly apposite in the FMSA context.[45] The Commission concluded that the Secretary's views were to be accorded "special weight," and that standard seems about right, albeit a bit amorphous. The critical point, however, is that the Commission's construction of its governing statute must be accorded some weight, even when its position differs from that of the Secretary's; otherwise, the Commission would be "little more than a specialized jury, an agency charged only with fact finding." [46] I believe that Congress intended a more active role for the Commission.

The majority renders the Commission's decision devoid of weight in this case, however, by concluding that its construction is "plainly incorrect and unsupportable," and therefore not entitled to deference.[47] It bases this conclusion on the ground, discussed above, that the scope of walkaround pay is "clearly coextensive" [48] with the basic walkaround right itself, and that the Commission's bifurcation of the two rights is erroneous.

I disagree. In my opinion the majority's focus on, in effect, a single sentence masks more of the meaning of subsection 103(f)

---

**43.** 2A Sutherland on Statutory Construction § 48.14 at 220 (4th ed. 1973).

**44.** *Helen Mining Co.* at 10; App. at 26.

**45.** *Helen Mining Co.* at 4–6; App. at 20–22.

**46.** *Brennan v. Gilles & Cotting, Inc.*, 504 F.2d 1255, 1262 (4th Cir. 1974) (OSHA context).

**47.** Maj. op. at 622–623 n.26.

**48.** *Id.* at 621.

than it reveals. I understand fully how the relevant sentence could *alone* be construed in the way that my colleagues and a dissenting member of the Commission understood it.[49] I submit, however, that when one examines the language of the entire section—as I believe should be done—it is apparent that the "plain language" is not at all plain and that the FMSA does not mandate congruence of compensation and walkaround rights. We have recently had occasion to note that courts, in construing statutory language, should " 'not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy.' "[50] Looking at the *"whole law,"* I believe that the bifurcation so emphatically condemned by the majority is, in fact, consistent with the statutory language.

To be sure, my interpretation of the relevant wording is but a simple conclusion, as is, I might note, the majority's construction. Like the Commission, however, I simply do not read the words in question as inextricably linking compensation and walkaround rights. The confusing language employed by Congress throughout section 103 makes decisive reliance on a single sentence in that provision, without the guiding assistance of relevant observations by a member of Congress, a risky endeavor, and I decline to join my colleagues in following that course. Ambiguity pervades subsection 103(f), and it seems to be most strange that the court turns away in this case from the legislative materials most relevant to the clarification of the ambiguity. The plain language doc-

trine does not require studied ignorance of enlightening congressional statements.

More could be said, but enough already has. I believe that the Commission correctly construed the FMSA, and I accordingly dissent.

---

**49.** Although two members of the five person Commission dissented in *Helen Mining Co.*, only one, Commissioner Lawson, construed the relevant language precisely as does the court today. *See Helen Mining Co.* at 24–31; App. at 40–47 (Lawson, Comm'r, dissenting). Commissioner Jestrab agreed that spot inspections gave rise to miner compensation rights, but concluded that the FMSA drew an implied distinction between the "frequent inspections" that he felt were authorized by § 103(a) and certain "additional inspections" that the Secretary of Labor might conduct that were not. That the two dissenting members of the Commission could not even agree on the question of which inspections were conducted "pursuant to . . . subsection (a)" demonstrates to me the

senselessness of ignoring the only relevant remarks in the legislative history and the sheer folly of the majority's contention that the meaning of § 103(f) is plain.

**50.** *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051, at 1061–62 (D.C. Cir. 1981) (en banc), *quoting Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962) (footnote omitted), *quoting Mastro Plastics Corp. v. National Labor Relations Board,* 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956), *quoting United States v. Boisdore's Heirs,* 8 How. 113, 122, 12 L.Ed. 1009 (1850).